UNITED STATES of America,
Plaintiff–Appellee,

v.

Ricky PEETE, Defendant–Appellant.

No. 89–6269.

United States Court of Appeals,
Sixth Circuit.

Argued Aug. 14, 1990.
Decided Nov. 28, 1990.

W. Hickman Ewing, Jr., U.S. Atty. (argued), Memphis, Tenn., for plaintiff-appellee.

Alan Bryant Chambers (argued), Handel R. Durham, Memphis, Tenn., for defendant-appellant.

Before MARTIN and WELLFORD, Circuit Judges, and SILER, Chief District Judge.*

BOYCE F. MARTIN, Jr., Circuit Judge.

Ricky Peete appeals his jury conviction and subsequent sentence for attempting to affect commerce by extortion in violation of the Hobbs Act, 18 U.S.C. § 1951.

Ricky Peete, who is black, was the elected city councilman for City Council District Seven in Memphis, Tennessee. Memphis's Charter provides that the legislative power for Memphis shall be vested in the City Council. The Council is comprised of thirteen members, one from each of the seven council districts, and six elected from the city at large. The Council, *inter alia*, fixes the municipal tax rates and approves and adopts all municipal budgets. In addition, the Council votes on resolutions relating to decisions by the Memphis and Shelby County Land Use Control Board. An appeal from the Land Use Control Board concerning a proposed subdivision project, Pigeon Roost, was to be heard by the City Council on February 28, 1989.

On October 26, 1988, Colonial Partners, Inc., a Memphis, Tennessee real estate development company, made an application to the Office of Planning and Development of Memphis and Shelby County concerning the proposed Pigeon Roost subdivision on Waring Road in Memphis. The two individuals involved with the project for Colonial Partners were Doug Dickens and Hank

---

* The Honorable Eugene E. Siler, Jr., Chief United States District Judge for the Eastern District of Kentucky, sitting by designation.

Hill. Richard Hall, a consultant and engineer, worked with Hill and Dickens on the project. The proposed development would utilize certain materials moving in interstate commerce.

On January 5, 1989, a Colonial Partners representative presented the project before the Land Use Control Board. The Board approved the project and the matter was set for a vote before the Memphis City Council.

On the morning of February 9, 1989, Dickens and Hall met with Councilman Peete at his City Hall office to seek his support for their project. That afternoon, Peete phoned Hall and told Hall that he would like to be paid $2,000 before the vote and $1,000 after the vote. Peete referred to this transaction as a "contract". Hall declined Peete's solicitation and then notified Dickens of the substance of Peete's call.

Dickens reported Councilman Peete's solicitation of a bribe to purchase his vote for approving the Pigeon Roost project to the United States Attorney's Office in Memphis. Federal Bureau of Investigation Special Agent Donald MacDonald then contacted Dickens and Hank Hill, who agreed to cooperate in a government investigation of Peete's alleged solicitation.

At the government's request, Hill contacted Peete by telephone on February 16, 1989. Hill informed Peete that he had different ideas about the situation than his partners and that he wished to meet with Peete at Peete's City Hall office. That afternoon, Hill met with Peete in his City Council office. Hill was wearing a "wire" during this meeting and the conversation was recorded.

During the course of this meeting, Peete discussed the number of votes needed to approve the proposed subdivision development, and he mentioned the names of other city councilmen. Peete stated that he could ensure a certain number of votes and passage of the proposal. Peete indicated the minimum amount of money that he would need for the proposal's success by holding up one finger. Hill stated that he would be willing to give Peete $1,000 up front and $1,000 after the vote. Peete replied, "Okay."

At trial, Peete testified that he thought Hill initiated contact with him to work on the recall effort to oust Memphis's mayor, Dick Hackett. Hill had stated that Peete held up one finger to indicate the cost of the bribe, $1,000; Peete testified that he was holding up his middle finger to express his blunt opposition to the mayor as part of the recall effort.

After Peete agreed to Hill's offer, Peete asked Hill if he were wearing a wire. Peete took Hill's evasive responses as a negative answer and then agreed to meet with Hill at 3:30 that afternoon to receive the first payment. Peete stated that the quick payment was "motivation, incentive [for Peete] to go to work right now."

After the meeting, Hill obtained ten $100 bills at his office. He then met with Agent Macdonald who photocopied the ten $100 bills Hill was to give to Peete. MacDonald gave Hill $1,000 in twenties and fifties to repay Hill who was using his own $100 bills for the bribery payment. Hill met Peete that afternoon at a Shoney's restaurant in Memphis. This meeting was also recorded by the F.B.I. Peete made several statements to the effect of "it's not what you know, it's who you know." Peete stated that he hoped that Hill had brought an envelope; Hill said that he had not. Peete then asked that the money be handed to him under the table. Hill gave him the ten $100 bills under the table. Hill then said that after the election, he would give Peete another $1,000. Peete said that they should get together for lunch for that transaction because he disliked talking on the phone because he did not trust it. Peete then discussed the action he was going to take in regard to the vote and named the other councilmen to whom he would speak. Hill then said "Okay, we got a deal." Peete said "Okay."

At trial, Peete testified that he had wanted the money to be placed in an envelope because that is how a gentleman gives campaign donations. He stated that he felt the Memphis area where they were conducting the "donation" was not safe and

that he did not want to insult the minimum wage employees at Shoney's by having $1,000 waved in the air, so he asked Hill to hand the "donation" to him under the table.

At trial, the United States introduced evidence that Peete was having financial trouble at the time he solicited the bribe—namely, he was often behind in bank payments on an $18,104.60 loan. On the day Peete received the $1,000 bribe payment, the collection counselor at his bank had phoned Peete because he was two payments behind on the loan. Peete told her that he would make a payment on February 17, the next day, and one on February 28—the day of the vote on the Pigeon Roost proposal. The bank's records show that Peete made a cash payment of $317.17 on the loan on February 17. At trial, Peete admitted that none of the $1,000 campaign "donation" went into a campaign fund. He contended that he was repaying himself for loans that he had made to his campaign.

On February 24, 1989, Peete was arrested by F.B.I. agents. On March 20, 1989, Peete was indicted by a federal grand jury for violating the Hobbs Act, 18 U.S.C. § 1951. The indictment charged that from February 9 until February 24, Peete knowingly and willfully attempted to affect interstate commerce by extortion under color of his position as a city councilman. Peete filed various motions to compel discovery regarding the F.B.I.'s investigation and its contacts with the mayor's office. Those motions were denied by the district court as overbroad and beyond the scope of any governmental discovery obligations to a criminal defendant under both constitutional and Federal Rules of Criminal Procedure standards. Peete also challenged the nexus of his alleged crime with interstate commerce, the key element for federal jurisdiction in the Hobbs Act, in a motion to dismiss the indictment which was also denied.

On April 17, 1989, Peete raised the name of Congressman Harold Ford in a discovery request. Peete contended, in a later pretrial motion to compel discovery, that he was singled out for prosecution because he had refused to cooperate with the F.B.I.'s investigation of Congressman Ford.

Agent MacDonald provided affidavits and testified at trial that he had telephoned Peete in 1988 following an article which appeared in a Memphis newspaper on August 6, 1988 in which Peete made allegations against Congressman Ford. Peete had agreed to meet with Agent MacDonald to discuss those allegations, but on the day of the scheduled meeting, Peete was not at his residence and his attorney informed MacDonald that Peete no longer wanted to discuss Congressman Ford with the F.B.I. Peete also contended that Richard Hall, the developer partner who was initially contacted by Peete, met with Congressman Ford in February 1989 to "set up" Congressman Ford. Denying this allegation, Hall testified that he knew Congressman Ford, that Hall's brother worked in Congressman Ford's Washington office, and that Hall visited Congressman Ford because Hall was seeking, as recommended by Peete in their City Hall meeting, political assistance on the passage of the subdivision project. Hank Hill testified that he knew Congressman Ford as well, having constructed his house. These motions, asserting selective prosecutorial motive and calling for the dismissal of the indictment, were dismissed.

On June 26, 1989, the trial began. On June 30, 1989, Peete was found guilty by a jury on the one-count indictment. On September 15, 1989, Peete was sentenced to 30 months in prison, a $3,000 fine and two years of supervised probation. One of the conditions of probation was that Peete be prohibited from serving in or seeking public office. Peete appeals his conviction and sentence.

## I. Hobbs Act

Peete raises several issues challenging the applicability of 18 U.S.C. § 1951, the Hobbs Act, to the facts of this case. The Hobbs Act provides, in pertinent part:

§ 1951. **Interference with commerce by threats or violence.**

(a) Whoever in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by robbery or extortion

or attempts or conspires so to do, or commits or threatens physical violence to any person or property in furtherance of a plan or purpose to do anything in violation of this section shall be fined not more than $10,000 or imprisoned not more than twenty years, or both.

**(b)** As used in this section—

**(1)** The term "robbery" means the unlawful taking or obtaining of personal property from the person or in the presence of another, against his will, by means of actual or threatened force, or violence, or fear of injury, immediate or future, to his person or property, or property in his custody or possession, or the person or property of a relative or member of his family or of anyone in his company at the time of the taking or obtaining.

**(2)** The term "extortion" means the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right.

**(3)** The term "commerce" means commerce within the District of Columbia, or any Territory or Possession of the United States; all commerce between any point in a State, Territory, Possession, or the District of Columbia and any point outside thereof; all commerce between points within the same State though any place outside such State; and all other commerce over which the United States has jurisdiction.

18 U.S.C. § 1951.

In this case, conviction under the Hobbs Act requires proof of an attempt to extort and a threatened interference with interstate commerce. *United States v. Jenkins,* 902 F.2d 459, 463 (6th Cir.1990) (citing *Stirone v. United States,* 361 U.S. 212, 215, 80 S.Ct. 270, 272, 4 L.Ed.2d 252 (1960)). Here, the extortion stems from Peete's attempt to take Hill's property, with Hill's consent, induced under color of Peete's official right as a councilman with influence over real estate matters in Memphis. *See United States v. Aguon,* 851 F.2d 1158, 1162–67 (9th Cir.1988) (en banc). An "official's acceptance of money violates the Hobbs Act 'so long as the motivation for the payment focuses on the recipient's office.'" *United States v. Bibby,* 752 F.2d 1116, 1127 (6th Cir.1985) (quoting *United States v. Harding,* 563 F.2d 299, 307 (6th Cir.1977), *cert. denied,* 434 U.S. 1062, 98 S.Ct. 1235, 55 L.Ed.2d 762 (1978)), *cert. denied,* 475 U.S. 1010, 106 S.Ct. 1183, 89 L.Ed.2d 300 (1986). As we stated in *Bibby:*

> Obviously, this rule cannot be applied literally. Otherwise any political contribution could conceivably provide the basis for a Hobbs Act charge. What the Hobbs Act proscribes is the taking of money by a public official in exchange for *specific* promises to do or refrain from doing *specific* things. In other words there must be a *quid pro quo.*

752 F.2d at 1127 n. 1 (citations omitted).

Peete contends that Congress has no authority under the commerce clause to regulate an attempted impact on interstate commerce by way of a Hobbs Act extortion. The clear language of the Hobbs Act, 18 U.S.C. § 1951, prohibits attempts to affect commerce by extortion. Congress's power to regulate activity under the commerce clause is plenary. *United States v. DeMet,* 486 F.2d 816, 821 (7th Cir.1973), *cert. denied,* 416 U.S. 969, 94 S.Ct. 1991, 40 L.Ed.2d 558 (1974). "'The commerce clause endows Congress [with] full and plenary power to do anything and everything to protect interstate commerce—The specific question is whether in the statute involved the Congress has seen fit to exercise all of its power.'" *Id.* (quoting *Walling v. Goldblatt Bros.,* 128 F.2d 778, 781 (7th Cir.1942), *cert. denied,* 318 U.S. 757, 63 S.Ct. 528, 87 L.Ed. 1130 (1943)).

As stated by the Supreme Court:

> The Commerce Clause reaches in the main, three categories of problems. First, the use of channels of interstate or foreign commerce which Congress deems are being misused, as, for example, the shipment of stolen goods (18 U.S.C. §§ 2312–2315) or of persons who have been kidnapped (18 U.S.C. § 1201). Second, protection of the instrumentalities of interstate commerce, as, for example, the destruction of an aircraft (18 U.S.C. § 32), or persons or things in commerce, as, for example, thefts from interstate

shipments (18 U.S.C. § 659). Third, those activities affecting commerce. It is with this last activity that we are here concerned.

*Perez v. United States,* 402 U.S. 146, 150, 91 S.Ct. 1357, 1359, 28 L.Ed.2d 686 (1971) (Douglas, J.).

As is well-documented in case law, Congress has the power to regulate even intrastate commerce which has merely an indirect effect on interstate commerce. *See Wickard v. Filburn,* 317 U.S. 111, 63 S.Ct. 82, 87 L.Ed. 122 (1942) (regulation of production of wheat grown wholly for home consumption within Congress's commerce clause authority). The use of the term "affect" has been interpreted as triggering Congress's full regulatory power under the commerce clause. *DeMet,* 486 F.2d at 821–22. If Congress may regulate purely indirect effects on interstate commerce, *see Wickard, supra,* Congress's decision to regulate attempts to affect interstate commerce is fully within its power under the commerce clause. It is fully within Congress's constitutional authority to regulate commerce to proscribe attempts to alter or interfere with the lawful flow of interstate commerce. *See Stirone v. United States,* 361 U.S. 212, 215, 80 S.Ct. 270, 272, 4 L.Ed.2d 252 (1960).

While regulating attempts to affect interstate commerce may occasionally result in the Hobbs Act being employed to combat bribery and extortion in what are purely intrastate contexts, the reach of Congress's authority to enact such a statute has been upheld by the Supreme Court. "Extortionate credit transactions, though purely intrastate, may in the judgment of Congress affect interstate commerce. In an analogous situation, Mr. Justice Holmes, speaking for a unanimous court, said: '[W]hen it is necessary in order to prevent an evil to make the law embrace more than the precise thing to be prevented it may do so.' " *Perez,* 402 U.S. at 154, 91 S.Ct. at 1361 (quoting *Westfall v. United States,* 274 U.S. 256, 259, 47 S.Ct. 629, 630, 71 L.Ed. 1036 (1927)). In *Perez,* the Court upheld

Congress's enactment of legislation to combat loan sharking, 18 U.S.C. § 891 *et seq.,* despite Congress's failure to put the magic words, "interstate commerce," anywhere in that body of legislation.

In *Perez,* Justice Douglas upheld Congress's ability under the commerce clause to regulate classes of activity despite a lack of proof that "the particular intrastate activity against which a sanction is laid had an effect on commerce." *Id.* 402 U.S. at 152, 91 S.Ct. at 1360 (citing *United States v. Darby,* 312 U.S. 100, 61 S.Ct. 451, 85 L.Ed. 609 (1940)). In the Hobbs Act, Congress has continued to require, unlike the statute at issue in *Perez,* the use of the magic words, "interstate commerce." [1] However, the continued requirement that an effect on interstate commerce must be proved to sustain a Hobbs Act conviction does not in any way dilute Congress's power to regulate attempts to affect interstate commerce under the commerce clause.

In an abundance of legislative caution, Congress chose to require proof of an interstate commerce nexus for Hobbs Act convictions. "In order to be punishable as a substantive violation of the Hobbs Act, an extortionate scheme must have at least a *de minimis* effect on interstate commerce." *United States v. DiCarlantonio,* 870 F.2d 1058, 1060 (6th Cir.1989), *cert. denied,* —— U.S. ——, 110 S.Ct. 323, 107 L.Ed.2d 313 (1989); *United States v. Harding,* 563 F.2d 299 (6th Cir.1977), *cert. denied,* 434 U.S. 1062, 98 S.Ct. 1235, 55 L.Ed.2d 762 (1978). There is no requirement that there be an actual effect on interstate commerce—only a *realistic probability* that an extortion will have an effect on interstate commerce. *United States v. Staszcuk,* 517 F.2d 53, 58–60 (7th Cir.) (en banc), *cert. denied,* 423 U.S. 837, 96 S.Ct. 65, 46 L.Ed.2d 56 (1975) (emphasis supplied). Here, the developers, as in *Staszcuk,* purchased supplies and materials in the interstate market, which would have been affected by either approval or denial

---

1. In light of *Perez* it would be a welcome change if Congress would amend such laws as the Travel Act and Hobbs Act so that court time is not wasted by this unnecessary obeisance to outmoded conceptions of federalism by requiring proof of an interstate commerce nexus.

of the proposed project. That requirement, especially in cases of attempts, has been read broadly to allow purely intrastate activity to be regulated under the theory that there was a *realistic probability* that the activity would have affected interstate commerce. *See, e.g., Staszcuk,* 517 F.2d at 58–60. However, the case before us is easy because the government alleged and proved that the private business that Peete solicited was engaged in interstate commerce.

Peete maintains that the Hobbs Act's interstate commerce element, which is the Act's key to federal jurisdiction over state and local bribery and extortion, is not established when the money involved in an extortion scheme belongs to the Federal Bureau of Investigation. Peete relies on *United States v. DiCarlantonio,* 870 F.2d 1058 (6th Cir.1989), which held that money supplied by the Federal Bureau of Investigation in a "sting" operation to ensnare an extorter or a bribe acceptor does not have *de minimis* effect on commerce as a matter of law.

Peete's reliance on *DiCarlantonio* is misplaced. First, in *DiCarlantonio,* the court's analysis was strongly influenced by *United States v. Rindone,* 631 F.2d 491, 494 (7th Cir.1980), where the Seventh Circuit reasoned that F.B.I. funds had no actual effect on interstate commerce for the purposes of a conviction for the actual commission of a Hobbs Act violation. However, the Seventh Circuit held that F.B.I. funds were sufficient to establish an *attempt* to violate the Hobbs Act—the crime charged in this case. *Id.* This distinction was noted in *DiCarlantonio,* where we held that *"Rindone* erects no barrier to attempt charges where F.B.I. funds are used, and an attempted violation of the Hobbs Act carries the same potential penalties as a completed one." *DiCarlantonio,* 870 F.2d at 1061; *see also United States v. Hocking,* 860 F.2d 769, 777 (7th Cir.1988).

Secondly, the funds used by Hank Hill to pay Councilman Peete were supplied by Hill, not the Federal Bureau of Investigation. Hill obtained ten $100 bills, which were photocopied by the F.B.I. for identification purposes, and then gave those ten $100 bills to Peete in the Shoney's restaurant. The money given to Hill from the F.B.I. for reimbursement was in lower denominations. It is unquestionable that the F.B.I. money was not given to Peete, but rather to Hill, the interstate developer, for reimbursement purposes.

Peete also challenges his Hobbs Act conviction on the ground that because the Pigeon Roost Project was pulled from the Council's agenda, there is no proof that the developers would have purchased materials in interstate commerce and no proof that Peete's vote would have affected the entire Council's vote. Because Peete appeals from a judgment upon a verdict of guilty, we must adopt the view of the evidence most favorable to the Government. *Glasser v. United States,* 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942). As we stated above, there need only be a showing that there was a *realistic probability* that the defendant's actions would affect interstate commerce. *Staszcuk,* 517 F.2d at 58–60. The government adequately demonstrated that the developers routinely purchased materials in interstate commerce. Hence, viewing the evidence in a light most favorable to the Government, there is clearly a realistic probability that Colonial Partners would have followed their usual practice of purchasing materials in interstate commerce.

As for the impossibility argument, Peete is attempting to argue a factual impossibility because there was no actual vote on the project. This argument fails on two grounds. First, the Hobbs Act violation was complete upon Peete's receipt of the funds—indeed, it was complete for the charged *attempt* when Peete solicited the payment from Richard Hall. *See United States v. Rosa,* 560 F.2d 149 (3d Cir. 1977) (attempt conviction upheld for conspiracy to violate Hobbs Act despite defendant's absence at time of the attempt to extort), *cert. denied sub nom. Sica v. United States,* 434 U.S. 862, 98 S.Ct. 191, 54 L.Ed.2d 135 (1977). Second, factual impossibility is no defense to a charge of attempt to violate the Hobbs Act. *United*

*States v. Brooklier*, 459 F.Supp. 476 (C.D. Cal.1978). That holding is consistent with hornbook law on the applicability of the impossibility defense to attempt crimes in general:

> Under the traditional approach, legal impossibility but not factual impossibility is a defense to a charge of attempt. Legal impossibility is commonly defined as the case in which the defendant did everything he intended to do but yet had not committed the completed crime, while factual impossibility is the situation in which the defendant is unable to accomplish what he intends because of some facts unknown to him.

*United States v. Goodpaster*, 769 F.2d 374, 380 n. 5 (6th Cir.) (Martin, J., dissenting) (citing W. LaFave & A. Scott, Handbook on Criminal Law § 60 at 438 (1972)), *cert. denied*, 474 U.S. 983, 106 S.Ct. 391, 88 L.Ed.2d 343 (1985). An example of a Hobbs Act legal impossibility would be a citizen's lawful campaign contribution to a United States Senate candidate though the citizen incorrectly believes the contribution is illegal. *See Bibby*, 752 F.2d at 1127 n. 1. A factual impossibility would arise where a public official induces a payment to achieve some result despite the fact that the official has no actual ability to achieve that result. *Id.* at 1127. That is essentially the situation in this case. This case is a far cry from any conceivable legal impossibility scenario.

## II. Pre–Trial Issues

Peete contends that the district court's denial of his pretrial motions to compel discovery prevented him from investigating and proving a case of selective prosecution. He feels that the prosecution and "set up" were in retaliation for his refusal to furnish information against Congressman Harold Ford, who was under investigation by federal prosecutors in Memphis. He also feels that the Mayor of Memphis was connected to the investigation as demonstrated by the Mayor's statements to the press that he had cooperated with the F.B.I. in an investigation of Peete, the Mayor's decision to pull the subject of real estate development from the agenda of the city council, and the Mayor's political opposition to Peete.

 A defendant asserting selective prosecution:

> bears the heavy burden of establishing, *at least prima facie*, (1) that while others similarly situated have not generally been proceeded against because of conduct of the type forming the basis of the charge against him, he has been singled out for prosecution, *and* (2) that the government's discriminatory selection of him has been invidious or in bad faith, i.e., based upon such impermissible considerations as race, religion, or the desire to prevent the exercise of his constitutional rights.

*United States v. Bustamante*, 805 F.2d 201, 202 (6th Cir.1986) (quoting *United States v. Berrios*, 501 F.2d 1207, 1211 (2d Cir.1974)). In *United States v. Schmucker*, 815 F.2d 413, 418 (6th Cir.1987), we held that "[a] defendant may ... be entitled to discovery on the issue of selective prosecution if he introduces some evidence tending to show the existence of the essential elements of the defense." (quotations omitted); *see United States v. Adams*, 870 F.2d 1140, 1146 (6th Cir.1989) (citing *Schmucker*). Peete, aside from his own self-serving affidavit and an affidavit from his counsel, did not point to any evidence that others similarly situated were not prosecuted. His assertions that he was prosecuted for not assisting the government's investigation of Congressman Ford, who is also black, and that racial considerations motivated the government's decision to charge him were similarly unsupported. Nevertheless, on June 9, 1989, the district court held a hearing on the defendant's allegations and concluded that the government had provided *all* the requested discovery regarding Congressman Ford and that the motion was moot as to that issue. As for the general contention that Mayor Hackett motivated the investigation of Peete for political reasons, the court concluded that no evidence supported that contention. Based on the record, we agree with the district court and find that the motions were properly denied.

Peete next claims that the tape recordings of his conversations with Hill should have been suppressed because they were seized in violation of the fourth amendment. He further contends that "targets" of government operations are, prior to any arrest or indictment, supposed to be informed of their fifth amendment rights. He also asserts that Hill and Hall were not reliable informants because they had never before furnished information to the police. Peete maintains that he failed to make the suppression motion before trial, as required in Fed.R.Crim.P. 12(b)(3), because he did not know that Hill and Hall were working with the F.B.I. until trial.

These contentions are frivolous. In *United States v. White,* 401 U.S. 745, 752–53, 91 S.Ct. 1122, 1126–27, 28 L.Ed.2d 453 (1971), the Supreme Court explicitly upheld the admissibility of the testimony of government agents who conducted surveillance when an informant consented to recording a conversation with the defendant. *See also United States v. Jones,* 801 F.2d 304, 315 (8th Cir.1986); *United States v. Davis,* 780 F.2d 838, 846 (10th Cir.1985).

■ As to Peete's claim that targets of government operations are entitled to be advised of their "right to remain silent," we note that the procedural safeguards established in *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), only apply to situations involving custodial interrogations. *Id.* at 477–78, 86 S.Ct. at 1629–30. Here Peete was not in custody. Thus, we need not analyze the nature of Hill's relationship with the federal agents to determine whether he was induced to be a police informant. *See United States v. Willoughby,* 860 F.2d 15, 23–24 (2d Cir.1988) (*Miranda* warnings not required when an inmate made incriminating statements to an informant because police did not induce the informant to provide information), *cert. denied,* 488 U.S. 1033, 109 S.Ct. 846, 102 L.Ed.2d 978 (1989).

■ As for Hill and Hall's lack of reliability as informants because they had never before furnished information to the police, we first note that this theory would bar the initiation of any police investigation based on tips from ordinary citizens with no prior need to inform law enforcement officials about illegal activities. Peete is attempting to require a probable cause standard for mere police investigatory work which does not require searches or seizures. Here, no immediate search or seizure resulted from the informants' statements to the F.B.I. Thus no informant reliability inquiry is required.

### III. Jury Issues

■ Peete states that the "Arizona Method" of jury selection deprived the defendant of peremptory challenges and a fair trial. The "Arizona Method" involves calling 28 "qualified" veniremen and having the defense and the prosecution exercise their peremptory strikes at one time—the defense getting 10 and the government 6. The result, even if both sides strike different veniremen, is that 12 jurors will remain. Peete objects both to being required to exercise all his strikes at one time and at the same time as the prosecution exercised its strikes.

Federal Rule of Criminal Procedure, Rule 24(b) provides that the defense shall have 10 peremptory strikes and the government shall have 6 peremptory strikes. The method used in this trial has been the standard method used in the Western District of Tennessee for a number of years and was no surprise to the defendant's counsel. This method of jury selection, also known as the "blind strike" method, has been approved by the Supreme Court and this circuit. *See Pointer v. United States,* 151 U.S. 396, 412, 14 S.Ct. 410, 416, 38 L.Ed. 208 (1894); *United States v. Mosely,* 810 F.2d 93, 96–97 (6th Cir.1987), *cert. denied,* 484 U.S. 841, 108 S.Ct. 129, 98 L.Ed.2d 87 (1987); *United States v. Anderson,* 562 F.2d 394, 396–97 (6th Cir.1977). No prejudice to Peete results from such a system.

■ Peete also maintains that the district court erred by failing to excuse veniremen Carol Durbin and Lambert Simeona for cause. Durbin stated to the court that she had not formed an opinion about the guilt or innocence of Peete and that she

would not have been affected by the publicity in the case. Upon questioning by defense counsel, she stated that she had read about the case in the *Commercial Appeal,* Memphis's daily newspaper, and that her impression was that perhaps Peete was guilty but that she "would not necessarily" go into the trial believing that he was guilty. Upon questioning by the district court, she responded that she would base her verdict on what she heard in the courtroom, not anything that she had heard before, and that she could be impartial and fair.

Simeona told the district court that he was familiar with the media coverage of the case but that he would render a verdict based solely in what happened in the courtroom. He was aware of Peete's contention that the case was the result of racial animus. Simeona stated that he thought that it was an open door whether or not he had personally rejected Peete's contention. He said that he knew that Peete would not have been indicted absent probable cause, an accurate statement of the law. The district court denied the challenges for cause.

In *United States v. Smith,* 748 F.2d 1091, 1093–94 (6th Cir.1984) (Martin, J.), we stated:

> Once an individual juror indicates on *voir dire* a prior opinion about an impending criminal trial, the Constitution requires that the juror be seated only if the trial judge determines that the juror can lay aside his opinion and render a verdict based on the evidence presented in court. It is not required, nor can it be expected, that a juror be totally ignorant of the facts and issues involved in a criminal prosecution. "To hold the mere existence of any preconceived notion as to the guilt or innocence of an accused, without more, is sufficient to rebut the presumption of a prospective juror's impartiality would be to establish an impossible standard." *Irvin v. Dowd,* 366 U.S. [717] at 723, 81 S.Ct. [1639] 1642–43 [6 L.Ed.2d 751 (1961)]. Rather, the trial judge must ascertain whether the juror is capable of putting aside his earlier views and reach a decision based only on the evidence presented at trial. Once such a determination has been made, it may not be overturned unless manifest error is shown. Moreover, the burden is on the defendant to show manifest error.

(citations omitted). Here, no manifest error has been shown.

■ Peete next argues that the prosecution's exercise of peremptory challenges against blacks deprived Peete of due process and a jury of his peers. In light of the Supreme Court's recent holding that the sixth amendment's fair cross-section requirement for jury composition does not govern the use of peremptory challenges, we consider only Peete's equal protection argument. *See Holland v. Illinois,* —— U.S. ——, 110 S.Ct. 803, 107 L.Ed.2d 905 (1990).

In the jury pool from which the petit jury was chosen, there were 19 whites and nine blacks. Five of the prosecution's six peremptory challenges were used against blacks. All ten of Peete's peremptory challenges were used to strike whites from the pool. We reiterate that these strikes were made simultaneously. The resulting petit jury was therefore composed of 8 whites and 4 blacks. The prosecution also removed a black juror from the alternate juror pool.

In *Batson v. Kentucky,* 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), the Supreme Court held that purposeful racial discrimination in the selection of a jury violates a defendant's right to equal protection. In order to establish a prima facie case, the defendant must prove three things: 1) that the defendant is a member of a cognizable racial group; 2) that the prosecutor has exercised preemptory challenges against members of the defendant's race; and 3) that the relevant circumstances raise an inference of purposeful discrimination. If the defendant can make out a prima facie case, the prosecutor must then present a neutral explanation for having excluded the jurors.

*United States v. McCoy,* 848 F.2d 743, 745 (6th Cir.1988).

The district court stated that Peete had made a sufficient showing for inquiring into the reasons for the prosecution's exclusion of the jurors. There was no assertion that the venire had been improperly selected in terms of *Batson,* or that there had been any pattern or practice of racial discrimination in jury selection in the past by the United States Attorney's office.

The prosecution's neutral explanation was that the excluded jurors were from Council District 7, Councilman Peete's district, or were employed by either the City or the Memphis Board of Education, where Peete had previously held office. Both the City and the Board of Education have their budgets voted on by the Council.

The prosecution excluded the jurors as follows:

Mrs. Hall: attended high school in Peete's district and worked for a hospital connected with the City of Memphis Hospital.

Mrs. Wiley: resided in Peete's district and said that she had been in some discussions where some people said that the case was due to racism and that Peete was innocent.

Mr. Fondren: a white male, is a contractor and he expressed dissatisfaction with his prior dealings with the City of Memphis. He is also a Special Deputy in the Shelby County Sheriff's Office where Peete's wife works.

Mrs. Ferby: lived in Peete's district, attended high school in Peete's district, and worked for Board of Education.

Mrs. Wallace: is employed by the City of Memphis Board of Education.

Ms. Norris: lives in Peete's district and attended same high school as Peete. The government also points out that she was unemployed.

Mrs. Swanson, alternate juror: attended Peete's high school. She said Peete looked like a nice man who she didn't think would do anything like the charges in this case. She also stated that a lot of people she spoke to did not think that Peete committed the charges.

Peete contends that the exclusions based on council districts were cloaked racial ex-clusions and that the exclusion of Norris, based on unemployment, was also racially motivated.

We first note that the prosecution's neutral explanation "need not rise to the level justifying exercise of a challenge for cause." *Batson,* 476 U.S. at 97, 106 S.Ct. at 1723. We must "give great deference" to the district court's findings on the credibility of the prosecution's asserted neutral explanations. *Id.* at 98 n. 21, 106 S.Ct. at 1724 n. 21. Those are factual findings which we cannot overturn absent a showing that the district court's findings were clearly erroneous. *See United States v. Davis,* 809 F.2d 1194, 1202–03 (6th Cir.), *cert. denied,* 483 U.S. 1007, 107 S.Ct. 3234, 97 L.Ed.2d 740 (1987) (district court's assessment of prosecution's neutral, non-discriminatory explanations for peremptory strikes is a factual finding). On the record before us, we cannot conclude that the district court erroneously found that the prosecution's asserted neutral reasons sufficiently justified its exclusion of blacks from the jury.

"The Supreme Court's mandate in *Batson* to consider all the facts and circumstances [surrounding the exercise of peremptory challenges] means that we cannot lay down clear rules as to the specific numbers or percentages that will constitute or refute a prima facie case." *United States v. Sangineto–Miranda,* 859 F.2d 1501, 1521 (6th Cir.1988). In *Sangineto–Miranda,* we listed some, but by no means all, of the factors to be taken into account in assessing the inference of discrimination necessary to make a prima facie case. *See id.* at 1521–22. Those factors are equally useful in reviewing the proferred neutral explanation by the prosecution to determine if the reasons given are pretextual:

If, after the jury selection process has ended, the final jury sworn has a percentage of minority members that is significantly less than the percentage in the group originally drawn for the jury (or in the whole jury pool or in the district), then that would be a factor pointing toward an inference of discrimination. If, on the other hand, the percentage of

minority members in the ultimate jury is the same or greater, that would be a factor tending to negate the inference of discrimination.

If there are minority members on the jury but the prosecutor did not use all its peremptory challenges, that would be a factor tending to refute discrimination. However, if all the prosecutor's challenges were used, that fact would point toward an inference of discrimination.

Moreover, if the defense did not display a pattern of strikes against non-minority members, that fact might support an inference of discrimination. Yet, if the defense has clearly engaged in a pattern of striking non-minority members, that might make an inference of discrimination arising from the prosecution's opposing strikes less tenable. As an extreme example, if the defense strikes all six whites from an original jury panel of six blacks and six whites, there is a lesser inference of discrimination from the fact that the prosecution's subsequent strikes fall solely on the six remaining blacks.

*Id.*

Here, roughly one-third of the members of the venire were black. After the peremptory strikes were exercised, one-third of the members of the petit jury were black. Interestingly, slightly over one-third of the pool of Memphis and Shelby County citizens from which juries for the Western District of Tennessee at Memphis are composed are blacks. Removing the citizens who reside in Council District Seven, which is 85–90% populated by blacks, but by no means the only substantial black City Council district,[2] still results in the fraction of blacks in the pool of potential jurors being approximately one-third of the pool.[3]

We also note that the prosecution did not use all of its peremptory challenges to strike black prospective jurors. However, Peete used all of his peremptory strikes to remove white prospective jurors from the venire.[4] Those factors, when weighed with the asserted neutral explanation for striking the five black members of the venire, support the district court's finding that the prosecution's explanation was not pretextual.

Peete also challenges the jury's assessment of guilt, stating that under *Jackson v. Virginia,* 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), a reasonable jury could not have concluded that he was guilty of an attempt to violate the Hobbs Act. The jury heard Councilman Peete's version of the events and the government's witnesses. As conceded at oral argument by Peete's counsel, the jury determined that the government's evidence was more credible and that it established Peete's guilt beyond a reasonable doubt. Upon review of the evidence in a light most favorable to the government, we hold that a rational trier of fact could reasonably have found beyond a reasonable doubt that Peete attempted to violate the Hobbs Act. *Jackson v. Virginia,* 443 U.S. at 319, 99 S.Ct. at 2789.

## IV. Sentencing Issues

Peete contends that his sentence's prohibition against his seeking or serving in an elected public office as a term of probation deprived him of his first amendment rights without due process.

---

**2.** Council District Six is over 90% populated by blacks. Council District Four is approximately 85% populated by blacks. July 31, 1990 Memphis Voter Registration Ward–Precinct Statistical File Detail Report.

**3.** Based on July 31, 1990 Memphis Voter Registration Ward–Precinct Statistical File Report.

**4.** We note that several state courts have held that a defendant may violate *Batson's* prohibition against racially-motivated peremptory strikes. *See, e.g., People v. Kern,* 75 N.Y.2d 638, 555 N.Y.S.2d 647, 554 N.E.2d 1235 (1990); *Commonwealth v. Soares,* 377 Mass. 461, 387 N.E.2d 499, *cert. denied,* 444 U.S. 881, 100 S.Ct. 170, 62

L.Ed.2d 110 (1979); *State v. Neil,* 457 So.2d 481 (Fla.1984). Those cases conclude that the defendant's channeling of a peremptory strike through the judge's enforcement of that strike provides the necessary governmental action required to trigger *Batson's* prohibitions. Whatever one thinks of the state court's reasoning, there is a fundamental appeal to a rule which penalizes a defendant who exercises racially-motivated peremptory challenges. Here, however, the prosecution did not challenge the defense's exercise of its peremptory strikes and we do not reach that issue.

18 U.S.C. § 3563(b)(6) specifically allows the court to impose as a condition of probation the authority to refrain an individual from engaging in a specified occupation, business, or profession bearing a reasonably direct relationship to the conduct constituting the offense.

Probation conditions that restrict fundamental rights are subject to careful review. *United States v. Terrigno,* 838 F.2d 371, 374 (9th Cir.1988). Probation restrictions may affect fundamental rights such as freedom of speech and freedom of association if the conditions are primarily designed to meet the ends of rehabilitation and protect the public. *Id.* In *United States v. Tonry,* 605 F.2d 144, 148 (5th Cir.1979), the Fifth Circuit upheld a probation condition barring the defendant, who had been convicted of violating federal election laws, from running for political office or engaging in political activities during the probationary period. The Hobbs Act is directed, *inter alia,* to attack abuses of public office by elected officials. Prohibiting an elected official convicted under the Hobbs Act from engaging in public service for a certain period of time serves the dual purpose of rehabilitating that official by insulating him or her from the same environment enabling them to violate the Hobbs Act and protects the public from that former official's recidivism. Consequently, we uphold the conditions of probation meted by the district court, finding that they will assist in Peete's rehabilitation and protect the public.

We reject Peete's contention that his probation conditions were delivered without affording him due process of law. The sentencing proceedings afforded Peete his fundamental due process rights—notice and an opportunity to be heard. *See Wolff v. McDonnell,* 418 U.S. 539, 557, 94 S.Ct. 2963, 2975, 41 L.Ed.2d 935 (1974).

Peete's final argument is that his sentence is harsh and excessive. We note that the sentence is within the applicable guidelines range. We find that Peete's sentence was within the district court's discretion to place Peete within the applicable range. To the extent Peete is claiming that his sentence is cruel and unusual because it was grossly disproportionate to the severity of his offense, we likewise reject his appeal. In *Solem v. Helm,* the United States Supreme Court held that in noncapital cases, the proportionality test requires the reviewing court to consider the gravity of the offense and harshness of the penalty, the sentences imposed on similarly situated criminals in the same jurisdiction, and the sentences imposed on similarly situated criminals in other jurisdictions. 463 U.S. 277, 290–92, 103 S.Ct. 3001, 3009–10, 77 L.Ed.2d 637 (1983). Peete has not shown that his sentence is more harsh than those received by other individuals in similar positions who were convicted under the Hobbs Act. Moreover, Peete's two-and-a-half-year term of incarceration is consistent with the Hobbs Act sentences of other convicted local and state officials. *See, e.g., United States v. Bibby,* 752 F.2d 1116 (6th Cir.1985), *cert. denied,* 475 U.S. 1010, 106 S.Ct. 1183, 89 L.Ed.2d 300 (1986) (Tennessee state judge received four-year prison term for Hobbs Act conviction in Western District of Tennessee). Thus, Peete's challenges to his sentence are rejected on all grounds.

For the reasons we have set out in the body of this opinion, Ricky Peete's conviction and resulting sentence are hereby affirmed.