Colleen MANETTA (97–1256); Albert Swieczkowski (97–1299), Plaintiffs–Appellees,

v.

MACOMB COUNTY ENFORCEMENT TEAM, a.k.a. Comet; Macomb County; Macomb County Prosecutor; Schram, Detective; Macomb County Sheriff (97–1256); Curtis Schram, Detective (97–1299), Defendants,

Eric Kaiser (97–1256); Eric Kaiser, Individually and in his official capacity (97–1299), Defendant–Appellant.

Nos. 97–1256, 97–1299.

United States Court of Appeals, Sixth Circuit.

Argued Feb. 6, 1998.

Decided April 9, 1998.

Mary Massaron Ross (argued and briefed), Plunkett & Cooney, Detroit, MI, for Defendant–Appellant.

Edward A. Servitto, Jr. (argued and briefed), Warren, MI, for Plaintiff–Appellee Manetta.

Lauren M. Tomayko (argued and briefed), Arthur A. Garton (briefed), Garton & Vogt, Warren, MI, for Plaintiff–Appellee Swieczkowski.

Before: MERRITT, KENNEDY, and BOGGS, Circuit Judges.

## OPINION

BOGGS, Circuit Judge.

Karen Manetta and her fiancé, Albert Swieczkowski, each commenced actions in Michigan state court against Eric Kaiser, a Macomb County Prosecutor, and other defendants not involved in this appeal. Both Manetta and Swieczkowski asserted various state tort law claims and claims under 42 U.S.C. § 1983 for alleged violations of their First, Fourth, and Fourteenth Amendment rights arising from Kaiser's role in the investigation and subsequent arrest and prosecution of the couple for extortion. The cases were removed to federal district court. The defendants' motions for judgment on the pleadings resulted in the dismissal of the state law claims and all of the constitutional claims except the section 1983 claims predicated on the alleged Fourth Amendment violations. The defendants later moved for summary judgment on these section 1983 claims and the district court issued a combined ruling denying Kaiser summary judgment on the basis of qualified immunity in both cases. For the following reasons we reverse the district court's ruling and hold that Kaiser should be granted summary judgment because he is entitled to either qualified or absolute immunity for all of the acts upon which the plaintiffs' remaining section 1983 claims are predicated.

## I

The events giving rise to this litigation began on November 2, 1993, when Karen Manetta quit her job at the Karam Brothers, Inc. A principal of Karam Brothers, Ray Karam, learned from his sister that Manetta had quit because she felt she was being sexually harassed. Karam then called Manetta at home to discuss the situation with her, but Manetta was not home and Karam spoke with her fiancé, Albert Swieczkowski. During this conversation, Swieczkowski told Karam that Manetta was going to file a sexual harassment suit against him and others at the company. Some time after this conversation, Karam spoke with his brother, Ken Karam, who is an attorney; his uncle;

and County Prosecutor Tom Landy. It is unclear exactly what Karam and Landy discussed, but, after their meeting, Karam and his uncle went to the state police and indicated to the police that they had been referred to them by Landy to investigate a "possible extortion."

Karam told the state police that Manetta had quit working for his company, that he did not know why she had quit, and that her fiancé, Swieczkowski, later accused him of sexually harassing her. According to Karam, Swieczkowski had "threatened" him with "a lawsuit and stated that for $200,000 Mr. Karam's family would not have to find out about this and this incident would not have to go any further." Karam also said that he had met with Swieczkowski and "cut a deal" with him to keep things quiet for $100,000.

The officer Karam initially spoke with referred him to a detective named Schram. Karam told Schram that Manetta had been a bad employee and was hired only because she was a friend of Karam's sister. Eventually Schram elicited from Karam, who was married and had young children, that he had been having an affair with Manetta. Karam also told Schram that Swieczkowski had stated that he and Manetta had consulted a lawyer and been advised that she had a strong claim for sexual harassment, but that he wanted to meet with Karam to discuss a settlement. According to Karam, Swieczkowski also said that "it would be a shame for [Karam's] wife and kids to find out about the affair" and that no one would say anything about the affair if Karam "were to pay the money."

After listening to Karam's version of events, Detective Schram gave Karam tape recording equipment and advised him to tape any future phone conversations he had with Swieczkowski or Manetta.[1] Karam subsequently recorded seven calls with the equipment Schram gave him.[2]

According to Schram's summaries of the taped phone calls, during the first of these conversations, Swieczkowski told Karam that he was not telling Manetta "what to do" and that any decision regarding settlement "will be her decision." Schram wrote in his notes that "it was quite clear at this point that the conversation centered around sexual harassment." Near the end of the conversation, Swieczkowski brought up the affair and said "it would be a shame for [Karam's] wife and kids to find out, and that if [Karam] agreed to the money his wife and kids would not find out."

The next taped conversation was initially between Manetta and Karam. Swieczkowski later got on the phone to discuss settling the case. According to Schram's summary, Karam told Swieczkowski that it would devastate his kids if they learned about the affair and Swieczkowski replied "[t]hat's the reason [Manetta] is willing to deal with it, and willing to settle on $100,000." Near the end of the conversation, Swieczkowski referred to an earlier meeting he claimed to have had with an attorney, whom he did not name, regarding Manetta's claim and Karam told Swieczkowski that he did not want to deal with Manetta.

Schram's summaries of the taped conversations indicate that Karam and Swieczkowski later discussed settling the suit. During one conversation, Karam said that Swieczkowski must "sign off as well" as Manetta. Swieczkowski replied that "he can't" because "he's really not involved." The conversation then turned to structuring the settlement in a fashion that would allow Manetta to avoid paying taxes on it.

The notes summarizing the next recorded conversation reveal that Karam told Swieczkowski that "he is willing to give up the cash, if [Swieczkowski and Manetta] are willing not to bring up the affair, to leave [his] family alone" and make sure "that there will be no publicity." Karam also spoke to Manetta during this conversation to get her assurance that she would not discuss the affair.

---

1. Before coming to the police, Karam had already taped some of his conversations with Swieczkowski and he shared these tapes with Schram. It is unclear from the record exactly what was said during these conversations.

2. The actual tapes were not part of the record and the parties rely on Detective Schram's summaries of the taped conversations, which are part of the record.

When Swieczkowski offered to have his lawyer fax settlement documents to Karam's lawyer, Karam rejected the offer, stating that he did "not want the attorneys involved."

In a fifth phone call recorded on November 23, 1993, Karam and Swieczkowski discussed the form of the $100,000 settlement. Apparently, at this point, Karam did not believe he had $100,000 in cash and offered a mix of cash, securities, and other assets worth $100,000. In response to Karam's suggestion that he raise the $100,000 by placing a lien on property he owned, Swieczkowski stated that he would speak with his attorney "to find out if that would be agreeable." On the same day this call was made, Detective Schram conducted a phone interview with Karam's sister, Karen. Karen had been a close friend of Manetta. She told Schram that she had spoken with Manetta about her decision to quit her job and her plans to file a sexual harassment suit. Karen was unable to get Manetta to disclose the name of her attorney. She believed that Swieczkowski was using Manetta and her situation "to gain money from her brother."

On November 23 and 24, Detective Schram spoke with Assistant County Prosecutor Eric Kaiser. Kaiser listened to some of the tapes Karam had made and read Schram's summaries of the tapes. He also discussed the tapes with Schram. Kaiser was aware that Swieczkowski had mentioned that he had an attorney to whom settlement documents could be sent. At this time, Kaiser advised Schram to instruct Karam that he should not initiate any further contact with Manetta and Swieczkowski and should speak with them only if they initiated contact.

Swieczkowski later beeped Karam, and Karam called him back and taped the conversation. According to Schram's summary of this conversation, Swieczkowski said that he and Manetta had spoken with their lawyer and decided to go ahead with the lawsuit. Swieczkowski also said that the affair would be part of the lawsuit but "hopefully it won't come out on the street, not from me or Colleen, in court that's a different story." After this conversation, Schram had Karam call Swieczkowski back "to find out further information." Swieczkowski was not home, but he called Karam back and engaged in another conversation that was taped. In this conversation, Swieczkowski said that all necessary papers were being sent to a process server and that the lawsuit had already been filed. This prompted Karam to agree to pay the entire $100,000 in cash. After listening to the tape of this conversation, Detective Schram called the Macomb County Clerk's office and verified that no lawsuit had been filed.

On November 30, 1993, the last taped phone conversation occurred.[3] During this conversation, Swieczkowski and Karam agreed to meet at a local restaurant to exchange the $100,000. Karam demanded that Swieczkowski and Manetta "sign a release" promising that they will never "bring up the affair again." Towards the end of the call, Karam reiterated that he was paying to settle the case because "he can't have his wife and kids find out" about the affair.

After this last conversation, Schram met again with Kaiser to brief him on what was happening. At this time, Kaiser assisted Schram in preparing a release that Karam would have Swieczkowski and Manetta sign in exchange for the money. Schram and Kaiser also arranged to get $40,000 in marked bills for Karam to use in the exchange. According to Schram, the release was drafted "[t]o add to the culpable evidence that existed in the case." Before the exchange, Schram had Karam draft a release in his own handwriting based on the document Schram and Kaiser had prepared.[4]

---

3. In the district court, Schram's summaries of the taped conversations were supplemented by his subsequent testimony in which he stated that, at some point, he had advised Karam "not to focus" on sexual harassment in his conversations with Swieczkowski.

4. The release Karam wrote out stated:

In exchange for asking Ray Karam for $100,-000 cash which I am paying on this date Al Swieczkowski and Colleen Manetta agree to never tell the public including Ray Karam's wife and children or family members that Ray and Colleen had a love affair. Al and Colleen will not ask me for any more money in the

The exchange occurred at a local restaurant on December 1, 1993. Detective Schram had plainclothes officers positioned around the restaurant to monitor the exchange. Karam gave the money to Swieczkowski and Manetta while they were sitting in their car. He gave the release he had drafted to Swieczkowski, who read and signed it, and then passed it to Manetta, who also signed it. Before the couple could leave the parking lot, they were arrested by the police. Once the couple was arrested, Detective Schram called Kaiser, and Kaiser told the detective to hold the couple on extortion charges. The next day, Kaiser got a state court magistrate to issue an arrest warrant for the couple. However, after a preliminary hearing, a state court trial judge dismissed all of the charges against Manetta and Swieczkowski. After the couple's arrest, it came to light that Manetta and Swieczkowski had in fact consulted with attorneys several times regarding Manetta's sexual harassment claims and that one attorney had advised them that the affair would probably be an issue if the case went to court.

## II

In assessing the section 1983 claims involving the couple's Fourth Amendment rights to be free from arrest without probable cause, the district court concluded that there was no probable cause to arrest Manetta and Swieczkowski for violating Michigan's extortion statute. The district court further found that indicia of probable cause were so lacking that an objectively reasonable government official could not have believed that Michigan's extortion law covered the actions of Manetta and Swieczkowski. Therefore, Kaiser's motions for summary judgment on the basis of qualified immunity were denied.

## III

On appeal, Kaiser argues that he was entitled to qualified immunity on the section 1983 claims alleging Fourth Amendment violations. These claims allege that Kaiser violated the Fourth Amendment rights of Manetta and Swieczkowski by counseling the police to

future, and this will be the only payment I have

pursue their investigation, by ordering the police to hold them on extortion charges, by pursuing arrest warrants for the couple, and by unsuccessfully prosecuting them for extortion. We hold that Kaiser was entitled to either absolute or qualified immunity for all of this conduct.

### A. *Absolute Immunity*

■■■ Prosecutors are entitled to absolute immunity for conduct "intimately associated with the judicial phase of the criminal process." *Imbler v. Pachtman*, 424 U.S. 409, 430, 96 S.Ct. 984, 995, 47 L.Ed.2d 128 (1976). This extends to "[a] prosecutor's decision to file a criminal complaint and seek an arrest warrant and the presentation of these materials to a judicial officer." *Ireland v. Tunis*, 113 F.3d 1435, 1446 (6th Cir.), *cert. denied*, — U.S. ——, 118 S.Ct. 560, 139 L.Ed.2d 401 (1997). Therefore, Kaiser is absolutely immune from the claims of Manetta and Swieczkowski to the extent that they rely on his actions of obtaining arrest warrants against them and prosecuting them for extortion.

### B. *Qualified Immunity for Advising the Police and Ordering the Arrest*

■■■ Kaiser is not, however, absolutely immune for either his role in the preliminary investigation of Manetta and Swieczkowski or his decision to order the couple held on extortion charges after the controlled exchange at the restaurant. *See id.* at 1447 & n. 7. Rather, he is entitled to qualified immunity for these acts. *Ibid.* Qualified immunity protects government officials performing discretionary functions from civil liability under federal laws unless their conduct violates "clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982). Thus, Kaiser is entitled to qualified immunity from the section 1983 claims of Manetta and Swieczkowski unless, when he acted, the law established the contours of the right allegedly violated so clearly that a reasonable official would have understood his acts were unlawful. *Anderson v.*

to make.

*Creighton,* 483 U.S. 635, 639–40, 107 S.Ct. 3034, 3038–39, 97 L.Ed.2d 523 (1987). Qualified immunity provides a broad range · of protection, as it protects "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs,* 475 U.S. 335, 341, 106 S.Ct. 1092, 1096, 89 L.Ed.2d 271 (1986).

In the present case, Kaiser is entitled to qualified immunity on the section 1983 claims of Manetta and Swieczkowski alleging that he violated their Fourth Amendment rights to be free from arrest without probable cause when he advised the police to pursue the investigation of the couple and when he ordered them held on extortion charges following the exchange. This is because, under the facts of this case and the applicable Michigan law, Kaiser reasonably could have believed that probable cause existed to justify his actions.

The Supreme Court has explained that probable cause constitutes "facts and circumstances within the officer's knowledge that are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed, is committing or is about to commit an offense." *Michigan v. DeFillippo,* 443 U.S. 31, 37, 99 S.Ct. 2627, 2632, 61 L.Ed.2d 343 (1979). Kaiser initially consulted with Detective Schram on November 23. At that time, he could reasonably believe, from speaking with Schram and reviewing the materials Schram had collected, that: (1) Karam had been referred to the police by County Prosecutor Tom Landy; (2) Manetta had quit working for Karam after she had an affair with him; (3) Karam had heard from Swieczkowski and his sister, Karen, that Manetta planned to file a sexual harassment suit against him and other people he worked with; (4) Swieczkowski had discussed settling this lawsuit with Karam and during these discussions he repeatedly mentioned that he had consulted with an attorney; (5) When Karam wavered about settling the suit, Swieczkowski said "it would be a shame if [Karam's] wife and kids were to find out about the affair" and that no one would learn of the affair if Karam "were to pay the money"; (6) Swieczkowski had indicated that settling was Manetta's decision and that he could not sign off on the settlement without her approval; (7) Swieczkowski was concerned about the tax consequences of any settlement; (8) Karam stated that he did not want "attorneys involved" when Swieczkowski offered to have his lawyer fax settlement documents to Karam's attorney; (9) Karen Karam was unable to get Manetta to disclose the name of her attorney and believed that Swieczkowski was using Manetta to get money from her brother. Based on this information, Kaiser advised Detective Schram to have Karam stop contacting Manetta and Swieczkowski and not speak with the couple unless they initiated contact. Swieczkowski did subsequently initiate contact. After further developments, Schram again consulted with Kaiser on November 30.

At this time, Kaiser learned the following additional information: (1) Swieczkowski had told Karam that Manetta was going ahead with the lawsuit and that it had already been filed and papers were being sent to the process server; (2) Swieczkowski then agreed to an all-cash settlement; (3) Detective Schram had verified that no lawsuit had been filed; and (4) Swieczkowski and Karam agreed to a time and place to exchange the money and sign a release. Upon learning this information, Kaiser helped Schram develop a release form for Karam to take to the exchange and arranged to get marked bills for Karam to use.

■ Although the exact boundaries of Michigan's extortion law are not totally clear, a reasonable official could have believed that there was reason to investigate Manetta and Swieczkowski for extortion. After Swieczkoswki lied about filing the lawsuit, a reasonable official could also have believed that he was justified in conducting the controlled exchange. Plaintiffs do not allege that Kaiser had any constitutionally suspect motive, such as their race, for continuing the investigation or setting up the controlled exchange. Absent such an impermissible motive, there is no basis for asserting that the actions Kaiser took before he ordered the couple's

arrest violated their constitutional rights.[5] The couple does state a constitutional claim in alleging that their arrest following the exchange violated their Fourth Amendment rights. However, Kaiser is entitled to qualified immunity on this claim because, under the facts of this case and the law in existence at the time Kaiser acted, a reasonable official could have believed that, under Michigan law, Manetta and Swieczkowski had committed extortion.

Michigan's extortion statute, M.C.L.A. section 750.213 provides:

> Any person who shall, either orally or by a written or printed communication, maliciously threaten to accuse another of any crime or offense, or shall orally or by any written or printed communication maliciously threaten any injury to the person or property or mother, father, husband, wife, or child of another with intent thereby to extort money or any pecuniary advantage whatever, or with intent to compel the person so threatened to do or refrain from doing any act against his will, shall be guilty of a felony, punishable by imprisonment in the state prison not more than 20 years or by a fine of not more than 10,000 dollars.

■ The district court erroneously determined that a reasonable official with the knowledge Kaiser had could not have believed there was probable cause to investigate and arrest Manetta and Swieczkowski under Michigan's extortion law. This error apparently resulted from the district court's reliance on a 1995 federal case and analogies to the law of other states and the Model Penal Code. The district court could not rely on a 1995 opinion to assess Kaiser's actions because, under existing qualified immunity jurisprudence, Kaiser's actions must be assessed in light of the law in existence "at the time [they were] taken." *Anderson v.*

*Creighton,* 483 U.S. 635, 639, 107 S.Ct. 3034, 3038, 97 L.Ed.2d 523 (1987). The conduct at issue occurred in 1993.

Additionally, the Michigan case law construing the state's extortion statute that was in existence when Kaiser acted interpreted extortion to cover a broader range of conduct than did the extortion laws of other states that the district court examined or the Model Penal Code. In *People v. Igaz,* 119 Mich.App. 172, 189, 326 N.W.2d 420 (1982), an intermediate appellate court construed Michigan's extortion statute to encompass "emotional injury." The extortion in *Igaz* was committed by a prisoner who wrote letters to his former girlfriend threatening that if she did not post his bond he would send nude photos of her to her ex-husband's attorney. *Id.* at 187, 326 N.W.2d at 426–27. At the time the prisoner wrote these letters to his former girlfriend, she was in the middle of a bitter custody dispute with her ex-husband. *Ibid.*

The Michigan Supreme Court later vacated the court of appeals judgment in *Igaz* and remanded the case for reconsideration of the issue of appellate review of sentencing in light of a recent Michigan Supreme Court ruling. *People v. Igaz,* 418 Mich. 893, 341 N.W.2d 467 (1983). However, Michigan's high court denied "in all other respects leave to appeal." *Ibid.* Accordingly, if Kaiser researched Michigan law in November 1993 to see whether the state's extortion statute covered threats to reveal an adulterous affair unless money was paid, *Igaz* was the only guidance. It indicated that such threats to inflict emotional injury were covered under the statute. Thus it was objectively reasonable for Kaiser to determine that Swieczkowski's alleged threats to reveal Karam's affair with Manetta constituted extortion under Michigan law.

---

5. The couple does not claim that Kaiser violated their constitutional rights by playing some part in the recording of their conversations with Karam or that the taping of their phone calls violated their constitutional rights. Even if their complaint did state such a claim, they would not have an actionable section 1983 claim. This is because neither the United States Constitution nor any federal statute prohibits law enforcement officials from recording or listening to phone conversations so long as one of the parties to the conversation has consented. *See, e.g., United States v. White,* 401 U.S. 745, 752–53, 91 S.Ct. 1122, 1126–27, 28 L.Ed.2d 453 (1971) (plurality opinion); *United States v. Peete,* 919 F.2d 1168, 1177 (6th Cir.1990). For purposes of this appeal, we need not address whether the taping of these conversations violated Michigan's eavesdropping statute, M.C.L.A. § 750.539c.

Certainly, the circumstances may have painted an ambiguous picture as to whether the couple was pursuing a lawsuit or trying to extort money from Karam by veiling a threat to disclose his adulterous affair with Manetta under the guise of settling a potential legal action. It was especially unclear at the time Schram first met with Kaiser. After that initial meeting, Kaiser advised Schram to tell Karam not to speak with the couple unless the couple took the initiative to contact him. After Swieczkowski did initiate further contact with Karam, subsequent developments made it much more reasonable to believe the couple was attempting to extort money rather than settle a legal claim. This was especially so after Swieczkowski told Karam that the lawsuit had been filed and Schram verified with the clerk's office that it had not. It was only after this development that Kaiser advised and assisted Schram in going ahead with the controlled exchange and ordered the couple arrested on extortion charges following the exchange. Although it later became apparent that the couple had been consulting with a lawyer and may have been attempting to settle a matter they were considering taking to court, Kaiser is entitled to qualified immunity. Qualified immunity does not evaporate simply because after the race it becomes apparent that the official picked the wrong horse. It is unavailable only if no reasonable official could have believed, based on the information available at the time he made his decision, that the action was constitutional. This was not the case here.

## III

Because Kaiser was entitled to either qualified or absolute immunity for all of the conduct forming the basis of Manetta's and Swieczkowski's section 1983 claims, we REVERSE the district court's ruling denying Kaiser's motions for summary judgment on these claims.