985 F.2d 562
 NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
UNITED STATES of America, Plaintiff-Appellee,
v.
Charles OKEEZIE, Defendant-Appellant.
 No. 92-1583.
 United States Court of Appeals, Sixth Circuit.
 Jan. 29, 1993.
 
 Before BOYCE F. MARTIN, JR., MILBURN and ALAN E. NORRIS, Circuit Judges.
 PER CURIAM.
 
 
 1
 Defendant Charles Okeezie appeals his conviction on four counts of drug trafficking: (1) conspiracy to possess with intent to distribute heroin in violation of 21 U.S.C. § 846, (2) conspiracy to import heroin in violation of 21 U.S.C. § 846, (3) possession with intent to distribute heroin in violation of 21 U.S.C. § 841(a)(1), and (4) importation of heroin in violation of 21 U.S.C. § 952.
 
 
 2
 On appeal, the issues are (1) whether the district court violated defendant's Fifth and Sixth Amendment guarantees to a fair and impartial jury where during voir dire he told a juror that it was not necessary to be "real impartial," that the juror need only be "impartial," (2) whether defendant was denied equal protection and his right to an impartial jury where the government used peremptory challenges to strike black prospective jurors from the jury, (3) whether defendant was denied his right to present a defense where the government indicted a key witness in defendant's favor "on the eve of trial," and the district court refused to permit the introduction of the witness' out-of-court statements and grand jury testimony in support of the defense, (4) whether defendant was denied due process where the government in its opening statement advised the jurors that Laura Richards would invoke her privilege against self-incrimination, and (5) whether defendant was denied his constitutional right to confront witnesses against him where the district court refused to permit defense counsel to question a witness regarding conversations the witness had with his attorney to establish the witness' motivation for incriminating defendant. For the reasons that follow, we affirm.
 
 I.
 A.
 
 3
 The government's key witness at trial was Christopher Nwankpa. Christopher Nwankpa, along with United States Customs Agent Genrich, testified to the following.
 
 
 4
 In the late summer of 1990, defendant Okeezie contacted a Victor Nwankpa ("Victor") about becoming involved in Victor's illegal drug business. This contact was made after defendant saw an article in a Ypsilanti, Michigan, newspaper regarding a series of search warrants which were executed on Victor's home, business, and bank accounts. However, because Victor was already under investigation by law enforcement agencies, he planned to leave the United States, and, therefore, he asked his brother, Christopher Nwankpa ("Christopher"), to work with defendant.
 
 
 5
 Defendant volunteered that he and his girl friend, Laura Richards, would travel to Nigeria to meet with Victor who would give them heroin to bring back to the United States. Prior to defendant's and Richards' departure, however, Victor called from overseas and changed the destination to Thailand where he and his cousin, Ugochuku Ogobonna, would hand over the drugs.
 
 
 6
 Richards and defendant were to have departed for Thailand on November 7, 1990; however, the day before defendant changed his mind and refused to go. Richards then went alone. Defendant accompanied Richards to the airport in Columbus, Ohio, to see her off to Thailand.
 
 
 7
 Richards returned to the United States on November 15, 1990, arriving in Detroit en route to Columbus, Ohio. In Detroit, the United States Customs Service searched her luggage and discovered 1,212 grams of heroin hidden in a false bottom of her suitcase. U.S. Customs agents then arrested Richards. Richards agreed to cooperate with the U.S. Customs agents and telephoned defendant and left a message that she was at the airport in Detroit. Agent Genrich testified at trial regarding Richards' willingness to cooperate and to make taped telephone calls to defendant for the limited purpose of explaining the controlled delivery to Christopher's apartment.
 
 
 8
 Meanwhile, defendant went to Detroit to pick up Richards, but he was not able to find her. During this time, Richards called Christopher at his apartment in Detroit to tell him that she was on the way to his apartment with the "stuff" that his brother had given her.
 
 
 9
 Unable to find Richards at the Detroit airport, defendant went to Christopher's apartment, and Christopher told him that Richards had called and was coming over. Christopher was suspicious because Richards was supposed to deliver the drugs to defendant. Thinking something was wrong, Christopher decided to leave his apartment. Defendant waited in the parking lot where, shortly thereafter, Richards arrived. She was observed by federal agents walking up to the door of the apartment carrying the suitcase with the heroin in it. She was met by defendant, and they embraced and went to his car. They placed the suitcase containing the heroin in the trunk of defendant's car, and defendant was then arrested by the United States Customs agents.
 
 
 10
 Telephone records introduced at trial showed that during the time Richards was in Thailand, four telephone calls were placed from defendant's home in Michigan to the hotels where Richards stayed in Thailand and that five calls were placed from defendant's home to the hotel in Thailand where Victor stayed. The records from Richards' hotels in Thailand showed that she called defendant's telephone number five times from Thailand and Christopher's telephone number in Michigan two times.
 
 
 11
 The defense argued that defendant Okeezie was not involved in the scheme to traffic drugs which his girl friend, Laura Richards, and the Nwankpa brothers devised. The defense maintained that Mr. Okeezie was used, first, as an unknown, passive participant in the offenses, and, second, as a convenient recipient of blame and an object of barter in Christopher Nwankpa's plea bargain.[1]
 
 B.
 
 12
 Defendant was indicted on all four counts by a federal grand jury in Detroit, Michigan, on December 5, 1990. Trial began on August 6, 1991, and the jury returned a guilty verdict on all counts on August 20, 1991. Defendant made a motion for a new trial which the district court denied on April 9, 1992. The district court then sentenced defendant to 180 months imprisonment and three years of supervised release on May 1, 1992. This timely appeal followed.
 
 II.
 A.
 
 13
 Defendant Okeezie argues that the district court violated his constitutional guarantees under the Fifth and Sixth Amendments to a fair and impartial jury by suggesting to prospective jurors that something less than absolute impartiality or absolute fairness by a juror was permissible. Defendant refers to a specific conversation which took place between the district court and a prospective juror while the district court was conducting voir dire.
 
 
 14
 Juror: I don't know if I can be real impartial.
 
 
 15
 The Court: Well, I don't want you to be real impartial. I just want you to be impartial.
 
 
 16
 Juror: I don't know if I could be.
 
 
 17
 The Court: Why?
 
 
 18
 Juror: My son was born two months early and spent two months down at Children's Hospital. I've seen a lot of children, and I had a good friend overdose about three or four years ago.
 
 
 19
 The Court: You don't think this is the kind of case that you could--
 
 
 20
 Juror: I don't know if I could be real fair.
 
 
 21
 Court: I don't want you to be real fair, I just want you to be fair. See, you keep putting that adjective.
 
 
 22
 J.A. 94.
 
 
 23
 Defendant admits in his brief that he failed to object contemporaneously to the district court's comments. Therefore, under Federal Rule of Criminal Procedure 52(b), we will review the district court's statements for plain error only. United States v. Ebens, 800 F.2d 1422, 1438 (6th Cir.1986); United States v. Smith, 561 F.2d 8, 13 (6th Cir.1977), cert. denied, 434 U.S. 958 and 434 U.S. 972 (1977) and 434 U.S. 1019 and 434 U.S. 1048 (1978). Plain errors are those errors that "seriously affect the fairness, integrity or public reputation of judicial proceedings." Ebens, 800 F.2d at 1438 (citation omitted). In reviewing for plain error, we must consider the entire record "against the background of all the evidence." Id.
 
 
 24
 Defendant correctly asserts that he is constitutionally entitled to a "panel of impartial, 'indifferent' jurors." Murphy v. Florida, 421 U.S. 794, 799 (1975). Defendant argues that the district court's statements to the prospective juror indicated to the other prospective jurors that there were different degrees of impartiality and fairness. Defendant further argues that "the trial judge unwittingly invited the jurors to apply an elastic standard based not on the constitutional ideal, but on their own subjective measure of the impartiality warranted by the circumstances as they viewed them." Defendant's Brief at 16.
 
 
 25
 The government compares the district court's comment in this case to the comment made by a prospective juror in United States v. Knipp, 963 F.2d 839 (6th Cir.1992). In Knipp, during voir dire and in front of the other prospective jurors, a juror stated that she knew one of the government's witnesses and that she would believe his testimony. The district court excused the juror and instructed the jury that "the credibility of any witness has to be weighed along with all of the evidence in the case and to make that determination based on the evidence in the case." We held that
 
 
 26
 it would require some hysteria to conclude that the juror's comment had any real impact on the impartiality of the remaining jurors who, it must be assumed, followed the district court's instructions to judge the witnesses' credibility for themselves.
 
 
 27
 Id. at 845.
 
 
 28
 Because the statement at issue in this case was made by the district court judge, the possibility of prejudice is greater, and an examination of the record as a whole is merited. The district court's comment that it did not want the prospective juror to be "real impartial," just impartial, is somewhat disturbing. Viewed in isolation, this comment is confusing and could lead prospective jurors who heard the comment to believe or misunderstand that there are varying levels or subjective levels of impartiality.
 
 
 29
 However, a review of the entire voir dire process reveals that the district court was quite concerned that each prospective juror would be able to review the evidence and render a verdict in a fair and impartial manner. The district court excused the prospective juror who said he could not be "real impartial," and each prospective juror was questioned as to whether he or she could be fair and impartial. At one point, the district court asked the entire jury pool if "any of you had any experience in the past which causes you to doubt your ability to sit as a fair and impartial juror in this case?" J.A. at 128. Finally, in its instructions to the jury, the district court, in accordance with Sixth Circuit Pattern Criminal Jury Instruction 1.02(4) (1981 Ed.), told the jury: "Do your jobs fairly. Don't let bias, sympathy or prejudice that you may feel towards either side influence your decision in any way." J.A. at 510. This instruction served to cure any confusing statement made by the district court during voir dire. While the district court's comments should not have been made, upon reviewing the record as a whole, we hold that the comments do not constitute plain error which would require reversal of defendant's convictions.
 
 B.
 
 30
 Defendant Okeezie argues that he was denied equal protection under the Fifth Amendment when the government exercised its peremptory challenges to prospective jurors in a racially discriminatory manner. The district court ultimately found that after prospective jurors were excused for cause, a total of 28 potential jurors cleared for cause remained. The strike system of exercising peremptory challenges was employed. Of the 28 remaining jurors, 23 were white and 5 were black.
 
 
 31
 The government exercised six peremptory challenges, three against white jurors and three against black jurors. The defense exercised ten peremptory challenges which were used against white jurors. Therefore, the jury consisted of two blacks or 16.6 percent of the jury.[2]
 
 
 32
 After the government exercised its peremptory challenges against three black prospective jurors, defense counsel objected arguing that the three challenges were racially motivated. The district court found at that time that because the government had exercised three of its six peremptory challenges, or 50 percent, a prima facie case had been established to show the government had acted in a racially discriminatory manner.
 
 
 33
 The government then offered reasons for its peremptory challenges. The government explained that a Mr. Wood was excused because his brother was a drug user. The government challenged Theresa Caldwell because she had family members who were law enforcement officers with the Detroit Police Department, and the government was concerned she may have "preconceived notions" and views unfavorable to the government. J.A. 174. The government later further explained that the U.S. Attorney's office had indicted several Detroit Police Officers. The government also stated that her demeanor indicated that "she didn't really want to be here...." J.A. 175.
 
 
 34
 Regarding the third black juror, the government stated that Gloria Seats was challenged because she was only a high school graduate, and the government was looking for better educated persons. She was single and the government wanted jurors with "firm community foundations," and her demeanor also indicated she did not want to serve. J.A. 175. The government later explained that while some prospective jurors may remain who possess only a high school education, those persons had a "more sophisticated employment history." J.A. 177.
 
 
 35
 At a hearing on April 9, 1992, in which the district court denied defendant's motion for a new trial, the district court held that the government had not exercised its peremptory challenges in a racially discriminatory manner. The court noted that although during the trial it had been "of the view that the defendant had made out a prima facie case of discrimination because 50 percent of the Government's strikes were directed to black prospective jurors, it is not so sure now." J.A. at 471. The district court then accepted the government's proffered reasons and found that the government had exercised its peremptory challenges against the three prospective black jurors on legitimate bases.
 
 
 36
 The seminal case for an alleged Equal Protection violation arising from the exercise of peremptory challenges against individuals on the basis of their race is Batson v. Kentucky, 476 U.S. 79 (1986). In United States v. Peete, 919 F.2d 1168, 1178 (6th Cir.1990), we stated that
 
 
 37
 [i]n Batson v. Kentucky ... the Supreme Court held that the purposeful racial discrimination in the selection of a jury violates a defendant's right to equal protection. In order to establish a prima facie case, the defendant must prove three things: 1) that the defendant is a member of a cognizable racial group; 2) that the prosecutor has exercised preemptory challenges against members of the defendant's race; and 3) that the relevant circumstances raise an inference of purposeful discrimination. If the defendant can make out a prima facie case, the prosecutor must then present a neutral explanation for having excluded the jurors.
 
 
 38
 (citation omitted). The prosecutor's neutral explanation "need not rise to the level justifying exercise of a challenge for cause." Id. at 1179 (quoting Batson, 476 U.S. at 97. In regard to the prosecution's neutral explanation, this court must "give great deference" to the district court's findings regarding the credibility of these explanations. Peete, 919 F.2d at 1179; Batson, 476 U.S. at 98 n. 21. In this connection, we cannot overturn the district court's findings regarding the prosecution's explanations unless the district court's findings are clearly erroneous. Peete, 919 F.2d at 1179.
 
 
 39
 Clearly, defendant Okeezie has established the first two prongs of the prima facie case. As a black, he is a member of a cognizable racial group, and the prosecutor has exercised peremptory challenges against three black persons. Thus, the focus of this discussion is on relevant circumstances which raise an inference of purposeful discrimination. In United States v. Sangineto-Miranda, 859 F.2d 1501, 1521 (6th Cir.1988), we discussed the use of statistics to raise an inference of discrimination.
 
 
 40
 If after the jury selection process has ended, the final jury sworn has a percentage of minority members that is significantly less than the percentage in the group originally drawn for the jury (or in the whole jury pool or in the district), then that would be a factor pointing toward an inference of discrimination. If, on the other hand, the percentage of minority members in the ultimate jury is the same or greater, that would be a factor tending to negate the inference of discrimination.
 
 
 41
 Id. at 1521-22. Other factors which are relevant in determining whether an inference of discrimination has been shown include: "(1) a pattern of strikes against black jurors in a particular venire; and (2) a prosecutor's questions and statements during the selection process." United States v. Clemons, 843 F.2d 741, 748 (3d Cir.), cert. denied, 488 U.S. 835 (1988) (citing Batson, 476 U.S. at 97). 1723). In Batson, the Supreme Court made it clear that there is no specific formula for complying with the third prong of the standard to make out a prima facie case. Instead, the Court stated:
 
 
 42
 We have confidence that trial judges, experienced in supervising voir dire, will be able to decide if the circumstances concerning the prosecutor's use of peremptory challenges creates a prima facie case of discrimination against black jurors.
 
 
 43
 476 U.S. at 97.
 
 
 44
 In this case, defendant first attempts to show an inference of discrimination by relying on a statistical analysis. Using defendant's own figures, defendant points to a disparity between 19.8 percent of those black persons who were in the jury pool and the government's use of 50 percent of its peremptory challenges against black prospective jurors. However, the proper statistical analysis to determine if a significant disparity exists, which will give rise to an inference of discrimination, is to compare the percentage of black persons in the jury pool or array to those who actually served on the jury. See, e.g., Peete, 919 F.2d at 1180 (no inference of intentional discrimination existed where roughly one-third of the members of the venire or jury pool were black and one-third of the members of the jury were black); United States v. Walton, 908 F.2d 1289, 1298 (6th Cir.1990) (no inference of discrimination arose where 15 percent of the venire [jury pool] was composed of black members and 20 percent of the jury including alternates was composed of black members), cert. denied, 111 S.Ct. 530 and 111 S.Ct. 273 and 111 S.Ct. 532 (1990); United States v. Mitchell, 877 F.2d 294, 303 (4th Cir.1989) (no inference of discrimination arose from the fact that the venire contained 29 percent blacks while the jury contained 25 percent blacks). Again using defendant's figures, in this case, 19.8 percent of the members of the venire or jury pool were black while 16.6 percent of the members of the jury were black. There is not a significant disparity between 19.8 and 16.6 percent. Therefore, defendant's attempt to satisfy the third prong of the prima facie case through the use of statistical analysis fails.
 
 
 45
 However, defendant is correct in arguing that the striking of a single black for racial reasons violates equal protection standards despite the fact that other black jurors are seated and valid reasons may exist for striking other black jurors. United States v. Battle, 836 F.2d 1084, 1086 (8th Cir.1987); see also Clemons, 843 F.2d at 748 "[W]e [cannot] conclude that inclusion of blacks on a jury bars a prima facie case, especially where other facts and circumstances may constitute an inference of prosecutorial discrimination in the selection process."). Consequently, where, as in this case, some black jurors are seated, a statistical disparity would not necessarily arise. Nevertheless, the defendant may use other means to show an inference of intentional discrimination against one or more black prospective jurors.
 
 
 46
 In this case, defendant also focuses on the reasons that the government gave to explain its peremptory challenges in order to raise an inference of discrimination. While the government is not required to articulate its reasons for exercising its peremptory challenges unless a prima facie case has been established, see Peete, 919 F.2d at 1178, once the reasons have been articulated, they may be examined for evidence of discriminatory intent given the fact that the district court is charged with considering all circumstances which may be relevant to defendant's claim. See Clemons, 843 F.2d at 748 ("[T]he Supreme Court stressed that trial judges must consider 'all relevant circumstances' that might give rise to an 'inference of purposeful discrimination.' "); see also Garrett v. Morris, 815 F.2d 509, 513 (8th Cir.) (where prosecutor volunteered reasons for peremptory challenges, these reasons could be examined to determine whether "the purposes of the peremptory challenges are being perverted"), cert. denied, 484 U.S. 898 (1987).
 
 
 47
 The only challenge to the government's explanations which warrants our scrutiny relates to the government's expressed reasons for excusing prospective juror Gloria Seats. As previously stated, the government explained that Gloria Seats was being excused, in part, because she possessed only a high school education, was single, and her demeanor indicated she did not want to serve. In Garrett v. Morris, 815 F.2d 509, 513-14 (8th Cir.), cert. denied, 484 U.S. 898 (1987), the Eighth Circuit held that the government's explanation for striking black prospective jurors because of a lack of education was pretextual where the government did not strike white prospective jurors whose educational experiences "differed in no significant way" from those of the black prospective jurors.
 
 
 48
 The record indicates that the government did not strike other white prospective jurors with similar educational backgrounds. Juror Zahn was a single female with a high school diploma working at a university hospital. Juror Videto was the wife of a dairy farmer with a certificate as a "certified professional secretary." J.A. 78. Juror Beeman was a financial specialist with a high school education and "some college." J.A. 63.
 
 
 49
 To the defendant's objection, counsel for the government stated during voir dire that other jurors with a high school education had more sophisticated job histories than did Gloria Seats. The district court was satisfied with this explanation, and we cannot say that his findings regarding the government's explanations are clearly erroneous.
 
 C.
 
 50
 Defendant incorporates several issues into his next issue statement: Was defendant denied his right to present a defense where the government indicted a key witness in his favor "on the eve of trial," and the trial court refused to admit the introduction of the witnesss' out-of-court statement and grand jury testimony in support of the defense?
 
 
 51
 At the hearing on defendant's motion for a new trial, the district court made findings of fact and conclusions of law as follows:
 
 
 52
 Defendant's argument that the Government is to be seriously faulted for the non-availability of Richards falls far short of the mark. Richards went back on a Rule 11 plea agreement when, after implicating Defendant at the Grand Jury, she said she could not testify he was involved in the scheme to import. The Court held an evidentiary hearing on Richards' declining to testify. Clearly she would have taken the Fifth Amendment whether indicted or not. Richards was deeply involved in criminal activity. The only way she could obtain a modest sentence was to cooperate. When she went back on her agreement with the Government to cooperate and changed her view of the facts, the Government had every right, indeed an obligation, to indict her. Richards would have been a devastatingly incredible witness with regard to Defendant's role in the import scheme. Defendant was not prejudiced by the non-availability of Richards' testimony. Such testimony would not have aided his cause in any way.
 
 
 53
 J.A. 472.
 
 
 54
 First, defendant argues that Richards' grand jury testimony should have been admissible under Federal Rule of Evidence 804(a)(1) as former testimony. However, as the government notes, defendant failed to argue at trial that Richards' grand jury testimony was admissible under Rule 804(b)(1). Thus, our review is limited only to whether or not failure to admit Richards' grand jury testimony constitutes plain error. United States v. Cox, 957 F.2d 264, 267 (6th Cir.1992). "[T]he plain error doctrine is to be used sparingly, only in exceptional circumstances, and solely to avoid a miscarriage of justice." Id. In this case, no miscarriage of justice occurred because the grand jury testimony inculpated defendant. This testimony would have simply undermined his defense. Therefore, no reversible error resulted from the court's refusal to admit this testimony.
 
 
 55
 Second, defendant argues that the district court erred in refusing to admit into evidence under Federal Rule of Evidence 804(b)(3) Richards' statements exculpating defendant which were made after her grand jury testimony. Defendant did present this issue at trial to the district court which determined the statements were inadmissible hearsay. "[T]he admissibility of a statement under Rule 804(b)(3) is committed to the sound discretion of the trial court...." United States v. Rhodes, 713 F.2d 463, 473 (9th Cir.1983), cert. denied, 464 U.S. 1012 (1983) and 465 U.S. 1038 (1984).
 
 
 56
 Rule 804(b)(3) provides, in relevant part, that the hearsay of an unavailable witness may be admitted if it is a
 
 
 57
 statement which was at the time of its making so far contrary to the declarant's pecuniary or proprietary interest, or so far tended to subject the declarant to civil or criminal liability ..., that a reasonable person in the declarant's position would not have made the statement unless believing it to be true. A statement tending to expose the declarant to criminal liability and offered to exculpate the accused is not admissible unless corroborating circumstances clearly indicate the trustworthiness of the statement.
 
 
 58
 (Emphasis added).
 
 Rule 804(a) states in relevant part that
 
 59
 [a] declarant is not unavailable as a witness if the exemption, refusal, claim of lack of memory, inability, or absence is due to the procurement or wrongdoing of the proponent of a statement for the purpose of preventing the witness from attending or testifying.
 
 
 60
 In this case, defendant argues that the reverse of the above statement is also true; i.e., where the adversary of the statement procures the absence of the witness, the witness is unavailable for purposes of Rule 804. Defendant further argues that Richards was unavailable because the government procured her absence by indicting her and thus, in effect, forced her to exercise her Fifth Amendment right not to incriminate herself by testifying. It is unnecessary, however, for us to consider this argument because regardless of whether Richards could be considered an unavailable witness for purposes of Rule 804, the district court properly excluded the statements as not being trustworthy because there were no corroborating circumstances as required by Rule 804(b)(3). J.A. 547-48.
 
 
 61
 Defendant also argues that this case is similar to Chambers v. Mississippi, 410 U.S. 284 (1973). We, however, view this case as clearly distinguishable from Chambers.
 
 
 62
 Third, defendant argues that the indictment of Richards "on the eve of trial," which discouraged Richards from testifying on defendant's behalf, is an independent ground for reversal.[3] Defendant contends the government's indictment of Richards improperly interfered with his right to compulsory process under the Sixth Amendment and to a fair trial as guaranteed by due process under the Fifth Amendment. See Washington v. Texas, 388 U.S. 14, 19 (1967) (holding that it is a fundamental element of due process of law that the defendant have the right to present his own witnesses to establish a defense).
 
 
 63
 In support of his argument, defendant relies on several cases which focus upon government misconduct in coercing a witness not to testify. See United States v. Hammond, 598 F.2d 1008, 1013 (5th Cir.1979) (defendant deprived of due process where FBI officer told defense witness who was indicted for a crime in another state that he "would have nothing but trouble" if he testified on behalf of the defendant), reh'g on other grounds, 605 F.2d 862 (5th Cir.1979); United States v. Henrickson, 564 F.2d 197, 198 (5th Cir.1977) (conviction reversed where government entered into plea bargain with co-defendant whose testimony would have exonerated defendant where the plea bargain provided that the co-defendant would not testify in any manner for defendant or face trial); United States v. Thomas, 488 F.2d 334, 336 (6th Cir.1973) (conviction reversed where Secret Service agent informed witness that he would be prosecuted for misprision of a felony if he testified on behalf of defendant).
 
 
 64
 Each of these cases, however, is distinguishable from the present case. There was no express plea agreement to prevent Richards from testifying on behalf of defendant. Nor was Richards threatened with prosecution by a government agent if she were to testify. Rather, based on Richards' own voluntary and uncoerced confession to customs agents, the government entered a plea agreement whereby she would receive a lesser sentence in exchange for testifying on behalf of the government. Part of this plea agreement required her to be truthful. She testified voluntarily before the grand jury. Thereafter, she apparently changed her story twice, and each time her story conflicted. Thus, she had effectively disabled herself as a government witness and had breached her plea agreement. We agree with the district court that the government did not act improperly in rescinding the plea agreement where Richards retracted her earlier, voluntary testimony, rendered herself an incredible witness, and effectively breached her plea agreement.
 
 D.
 
 65
 Defendant argues that he was denied due process where the government stated during its opening statement that Laura Richards would invoke her Fifth Amendment privilege against self-incrimination and would not testify. Defendant asserts that the government misled the jury regarding the circumstances which led to her absence and gave rise to inferences adverse to the defense. During opening statement, government counsel stated:
 
 
 66
 He [Christopher Nwankpa] has the constitutional right to remain silent, as does everyone in this country. Which is the same reason the government cannot call Laura Richards. You may be wondering whether or not Laura Richards is going to testify. The government cannot call her because she has been charged, and she also has that same constitutional right not to say anything about what happened.
 
 
 67
 J.A. 183. However, defense counsel also mentioned in his opening statement that Richards may not be testifying:
 
 
 68
 [V]arious Government agencies will reflect that the Nwankpas, Victor and Chris, were the organizers of this narcotics trafficking. And that they were aided, and perhaps assisted by one Laura Richards who may or may not appear, and maybe by her boyfriend, assisted by [sic] that's where the manipulative, crafty, clever Mr. Nwankpa comes in.
 
 
 69
 J.A. 501. Defense counsel noted again in his opening statement that Richards would not testify and noted in his closing argument that she did not testify. J.A. at 502, 512, and 513. Each time defense counsel implied that the government was hiding something.
 
 
 70
 As to this issue, the district court instructed the jury:
 
 
 71
 You have heard testimony about Laura Richards' involvement in the circumstances of this case. Laura Richards has not testified. You are to have no concern with the reasons why she has not testified and you are not to draw any inferences at all, for or against, either party because she has not testified.
 
 
 72
 J.A. 451.
 
 
 73
 In United States v. Vandetti, 623 F.2d 1144, 1148 (6th Cir.1980), we discussed the dangers of calling a witness at trial whom the government knows will invoke the Fifth Amendment privilege:
 
 
 74
 There are two constitutional problems which may arise when a witness is presented who refuses to testify relying upon the fifth amendment privilege. The first problem is that such a witness permits the party calling the witness to build its case out of inferences arising from the use of the testimonial privilege, a violation of due process. "Neither side has the right to benefit from any inferences the jury may draw from the witness' assertion of the privilege...." Nevertheless, although guilt is not properly inferable from the exercise of the privilege, it is feared that its assertion in the presence of the jury may have a disportionate effect on its deliberations.
 
 
 75
 (Citations omitted). We further noted that "[e]ven though a cautionary instruction may be useful, it may not be sufficiently ameliorative in all cases." Id. (citation omitted).
 
 
 76
 As defendant admits, "making a jury aware that a witness has invoked the Fifth Amendment privilege is not per se reversible." Defendant's Brief at 44; see Namet v. United States, 373 U.S. 179, 186 (1963). In Frazier v. Cupp, 394 U.S. 731 (1969), the prosecutor commented in his opening statement on some of the testimony he expected would be presented by a witness who later asserted his Fifth Amendment privilege. The district court later cautioned the jury that they "must not regard any statement made by counsel in your presence during the proceedings concerning the facts of this case as evidence." Id. at 734. The Court held that the limiting instructions given by the district court "were sufficient to protect petitioner's constitutional rights." Id. at 735.
 
 
 77
 In this case, the limiting instruction was far more thorough than that in Frazier, and the prosecutor did not make any statement regarding what he believed Richard's testimony would include. However, there is another distinction between this case and Frazier. In Frazier, the court found that the prosecutor had a good faith belief that the witness would testify. In this case, the prosecutor knew that Richards would not testify because Richards had stated in an evidentiary hearing prior to trial that she would not testify.
 
 
 78
 As we stated in United States v. Castro, 908 F.2d 85, 89 (6th Cir.1990),
 
 
 79
 [i]n order to deny a defendant a fair trial, prosecutorial misconduct and improper argument must be "so pronounced and persistent that it permeate[d] the entire atmosphere of the trial." Inappropriate remarks by the prosecutor do not alone justify reversal of a criminal conviction in an otherwise fair proceeding, as long as the jury's ability to judge the evidence fairly remains intact. In order to decide if the prosecutor's remarks denied the defendant a fair trial, a reviewing court may consider, along with other factors, the potential of the remarks to prejudice the defendant or confuse the jury and the strength of proof against the defendant.
 
 
 80
 (Citations omitted).
 
 
 81
 In denying defendant's motion for a new trial, the district court found that the government had an "obligation" to explain why Richards was not testifying and that defendant had taken "advantage of Richards' nonavailability" to argue to the jury that her presence would have been beneficial to defendant. A limiting instruction that the jury was not to draw any inferences from Richards' absence should have been sufficient. However, given the limited nature of the government's comment, the district court's instruction to the jury, and the fact that defense counsel attempted to create his own inference from Richards' absence, it cannot be said that the government's comment amounts to prosecutorial misconduct which so permeated the entire atmosphere of the trial as to deny defendant a fair trial. If any error was committed, it was harmless beyond a reasonable doubt.
 
 E.
 
 82
 Defendant argues that the district court denied his right under the Sixth Amendment to confront adverse witnesses when the district court refused to allow defense counsel to cross-examine Christopher Nwankpa regarding conversations he had with defendant's attorney prior to trial in order to establish that Nwankpa had a motive for incriminating defendant. This attorney was the same attorney who represented defendant at trial and who sought to cross-examine Nwankpa regarding what he, defendant's attorney, had told Nwankpa about the crime Nwankpa was charged with.[4] The court also ruled that defendant's counsel could not interject himself or his name into the cross-examination.
 
 
 83
 It is within the sound discretion of the district court to determine the extent to which cross-examination may proceed. United States v. Slone, 833 F.2d 595, 601 (6th Cir.1987). Defendant's argument is entirely meritless. Defendant's attorney was given ample opportunity to extensively question Nwankpa regarding his possible motives for incriminating defendant. Further, Nwankpa was cross-examined at length regarding his plea agreement with the government and the fact that instead of recommending a possible life term imprisonment, the government was recommending only 121 months imprisonment.
 
 
 84
 Defendant relies primarily on Davis v. Alaska, 415 U.S. 308 (1974), to support his argument. Davis is distinguishable from this case. Defense counsel was clearly able to show that Christopher Nwankpa might be seeking to incriminate Okeezie in order to avoid blame himself and to avoid a far harsher sentence than he might otherwise receive. It was unnecessary for defense counsel to inquire into the specifics of Christopher Nwankpa's contacts or conversations with defendant's attorney in order to show prejudice or bias. Therefore, the district court did not abuse its discretion in refusing to allow defense counsel to question the witness on that basis.
 
 III.
 
 85
 For the reasons stated, the judgment of the district court is AFFIRMED in all respects.
 
 
 
 [1]
 Because the sufficiency of the evidence to sustain the verdict has not been challenged, only the basic, pertinent facts are stated herein
 
 
 [2]
 In ruling on defendant's motion for a new trial, the district judge stated: "The array from which the venire was chosen, the jurors were selected which was 11.5 percent black." J.A. 471
 
 
 [3]
 It is unclear from the record exactly when Richards was indicted. The government states in its brief Richards was indicted one month before defendant's trial. Defendant has not disputed this contention
 
 
 [4]
 This attorney, Mr. Pitts, had previously represented Christopher and Victor Nwankpa regarding matters encompassed in the conspiracy at issue. After a hearing on May 31, 1991, in which the district court advised defendant that his counsel had a conflict of interests which may hinder his defense, defendant waived his right to conflict-free counsel. See United States v. Straughter, 950 F.2d 1223, 1234 (6th Cir.1991), cert. denied, 112 S.Ct. 1505 (1992) ("A defendant may make a knowing, intelligent, and voluntary waiver of her right to conflict-free counsel....")