73 F.3d 361
NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
 Andrea ELLIS; Jacqueline Ellis, next friend of Gerald
McCullough, a minor, Plaintiffs-Appellants,
v.
Robert FICANO, Wayne County Sheriff, et al., Defendants,
and
Pamela J. Elsey, Kenneth Hunter, Melvin Turner, Steve
Koester, John Walker, Michelle Delduco, David Dibiassi,
Curlie Thompson, Geroge McMillan, Roy Adams, William Hodges,
Barry Smith, Phillip Maddox, and Scott Roberts, Defendants-Appellees.
 No. 94-1039.
 United States Court of Appeals, Sixth Circuit.
 Dec. 27, 1995.
 
 Before: MILBURN and NELSON, Circuit Judges; and MORTON,[1] District Judge.
 PER CURIAM.
 
 
 1
 Plaintiffs Andrea Ellis and Jacqueline Ellis, on behalf of her minor son Gerald McCullough, appeal the judgment for the defendants in this civil rights action arising from a drug raid on the plaintiffs' house. Plaintiffs alleged that the search for narcotics at their residence was unreasonable for several reasons, including (1) the search warrant was based on a knowingly false affidavit, (2) the search warrant did not adequately describe the place to be searched, and (3) the warrant was executed in an unreasonable manner. Andrea Ellis's complaint named 5 defendants, and Gerald McCullough's complaint named 16 defendants. The actions were consolidated for purposes of discovery and trial.
 
 
 2
 Some of plaintiffs' claims and most of the named defendants were dismissed before going to the jury, either through voluntary dismissal, the district court's order on summary judgment, or the district court's judgment as a matter of law at the end of the proof. The jury conducted deliberations on narrow claims against only three individual defendants, and returned a verdict in favor of all three defendants. On appeal, the issues are (1) whether the district court erred in refusing to grant a mistrial on grounds that the defendants improperly exercised peremptory challenges based on race; (2) whether the district court erred in granting judgment as a matter of law, thereby dismissing 10 out of 13 individual defendants and several of the plaintiff's substantive theories; (3) whether the district court erred in granting the defendants' motion for summary judgment on plaintiffs' due process claims; (4) whether the district court erred in granting defendants Pamela Elsey, Steve Koester and Kenneth Hunter's motion for summary judgment on plaintiff's state tort claims; (5) whether the district court erred in granting the federal agents' motions for summary judgment on plaintiffs' Sec. 1983 claims; and (6) whether the district court abused its discretion when it refused to allow plaintiffs to present two rebuttal witnesses. For the reasons that follow, we affirm.
 
 I.
 A.
 
 3
 This cause of action arose after several law enforcement officers executed a search warrant at 638 Pingree Street in Detroit, Michigan, on October 23, 1987. Plaintiff Andrea Ellis had lived in the house on Pingree since the early 1970s. Andrea Ellis is the former wife of James Ellis, who was the target of police investigation in the fall of 1987. Andrea and James married in 1963 and divorced in 1965, and, according to Andrea, James had never been inside her house. In October 1987, Andrea Ellis lived at 638 Pingree with her daughter, Jacqueline Ellis, Jacqueline's three children, four-year-old Gerald McCullough, two-year old Brittany and six-week-old Eden, and Montrisse Ellis, the daughter of James Ellis and another woman. Montrisse's mother and James Ellis lived in Florida and Montrisse had lived with Andrea for over two years. Occasionally, when James visited the Detroit area, he would pick Montrisse up at the house.
 
 
 4
 The narcotics investigation that precipitated the search of 638 Pingree Street was a federal investigation in conjunction with the Wayne County Sheriff's Department. The 14 individual defendants who participated in the search were employed by either Wayne County or the Drug Enforcement Agency (DEA). Defendants Pamela Elsey, Kenneth Hunter and Steve Koester were employed by the Wayne County Sheriff's Office, but were assigned to the Wayne County Joint Federal Task Force pursuant to an agreement between the Sheriff's Department and the DEA. Although on the county payroll, these three individuals were acting as DEA Task Force Agents. Defendants John Walker, Melvin Turner, Michelle Delduco, David DiBiassi and Curlie Thompson were Wayne County deputies. Defendants George McMillan, Roy Adams, William Hodges, Barry Smith, Philip Maddox and Scott Roberts were special agents of the DEA.
 
 
 5
 In mid-October, 1987, defendants Hunter & McMillan received information from a confidential informant named Kenneth "Keno" Cooper that James Ellis, a suspected drug dealer, was bringing heroine and cocaine into Detroit, where he would store it at various locations and then distribute it. Cooper advised that James Ellis's two daughters were involved. The agents began surveillance of the locations in an effort to verify Cooper's information.
 
 
 6
 One of the three primary locations identified by Cooper was Andrea Ellis's home, 638 Pingree. Hunter and McMillan testified that on October 20, 1987, Cooper made an undercover purchase of suspected narcotics at that address. Indeed, in his affidavit in support of a search warrant, Hunter stated he was personally present on October 20, 1987 and witnessed the informant make a buy from within the house. At trial, however, Hunter and McMillan testified that the buy did not take place inside the house. Rather, they testified that Montrisse Ellis had come out of the house to deliver the package, which later tested negative for narcotics.[2]
 
 
 7
 On October 23, 1987, Hunter and McMillan decided to seek search warrants for three locations identified by Cooper: the residence on Pingree Street, a residence on Meyers Street, and a hotel room on Eight Mile Road. In his affidavit to secure the warrant for the Pingree residence, Hunter described the place to be searched as 627 Pingree in Detroit, a two-story single family dwelling with red stucco siding. He further described the dwelling as the third house west of Second Avenue, on the north side of the street. The objective of the search was to seize illegal narcotics and related items and firearms, as well as the person of James Ellis. Based on this affidavit, a state judge issued a search warrant for the above described premises. That night, the search warrant was in fact executed at Andrea Ellis's home at 638 Pingree.[3]
 
 
 8
 A debriefing was held for the defendants at the DEA office, and the defendants, with the exception of Hunter, proceeded to the Pingree Street location to execute the search warrant. George McMillan was in charge of the raid. The five DEA special agents, two Joint Task Force agents (Elsey and Koester), and five Wayne County deputies assisted in the warrant's execution. Hunter, whose affidavit secured the search warrant, did not participate in the actual search.
 
 
 9
 When the defendants arrived to execute the warrant, plaintiffs Andrea Ellis and her four-year-old grandson Gerald McCullough were the only ones home. In large part, plaintiffs sued over the manner in which the search warrant was executed. Specifically, plaintiffs alleged that (1) the defendants improperly forced entry into the house before knocking, announcing their presence and allowing a reasonable time for plaintiffs to answer; (2) the defendants detained them for an unreasonable duration; (3) some of the defendants verbally harassed them, threatened them, pointed firearms, and touched Gerald on the shoulder with the barrel of a rifle; and (4) the defendants caused unnecessary property damage to the house during execution of the warrant. The proof at trial on these issues was as follows.
 
 
 10
 George McMillan, a DEA special agent and the head of the investigation, testified that the law enforcement officers arrived at the 638 Pingree address between 6:15 and 6:30 p.m. on October 27, 1987. Just as they began to announce their presence, the entry team noticed that the warrant said 627 Pingree, but the house said 638 Pingree, and "everything came to a complete halt." McMillan assured the team that, based on his personal knowledge, this was the correct location.[4] McMillan testified that by that point, they had been standing on the porch for approximately 10-15 seconds. They then knocked and announced their presence, waited a reasonable time, then forced entry through two front doors.
 
 
 11
 Andrea Ellis testified that the raid occurred very soon after 4:00 p.m. Gerald was watching Duck Tales, his favorite television show, which came on at that hour. Andrea was preparing for a bath in the second-floor bathroom, while Gerald was in the bedroom across the hall.
 
 
 12
 She testified that Gerald was terribly frightened and came to her, and they found themselves staring down the bannister at a plain-clothed man, whom she later identified as Curlie Thompson, who pointed a gun at her and said, "Bitch, if you run, you're dead."
 
 
 13
 Andrea went towards the bathroom. She testified that Pamela Elsey and Scott Roberts pointed guns at her and told her to get down. When Roberts allowed her to get up, he made her keep her hands on her head even though she told him she had just had surgery and that it was painful. After she got up, Roberts asked her if she had any weapons, and she answered no. Roberts went to search her, but Elsey said that Andrea obviously didn't have any weapons because her nightgown was transparent. She was eventually allowed to get a robe.
 
 
 14
 Gerald McCullough, who was 4 years old in 1987 and 10 years old at the time of trial, testified that he heard the knock on the door and that the officers busted in because his grandmother took too long to answer it. He testified that he witnessed Thompson's, Roberts' and Elsey's conduct toward his grandmother. He then ran toward the back stairs crying, and Steve Koester pulled a gun on him and pointed it at him. He heard Michelle Delduco say to Koester, "Don't pull that trigger." He was crying and frightened, and John Walker told him, "Shut up, that's what happens to bad boys." He further testified that McMillan hit him twice on the shoulder with the barrel of a rifle. After he and his grandmother were escorted downstairs, he heard Elsey threaten his grandmother by saying, "If you don't tell them where the drugs are, they're going to hurt you real bad."
 
 
 15
 Andrea Ellis, Jacqueline Ellis and Montrisse Ellis described extensive property damage as a result of the raid, including broken glass, doors knocked off their hinges, large holes knocked in the walls of the hallway, holes in the plaster, clothes strewn everywhere, pictures crumbled, damaged closets and wood panels upstairs. Andrea's brother took pictures of the damage the day after the raid. The pictures introduced at trial depicted damage to the front door, a broken stained glass panel in a closet door, and a second-floor door knocked off its hinges. Neither Andrea Ellis nor Gerald could identify the specific officer or officers responsible for the property damage.
 
 
 16
 The defendants testified quite differently regarding the manner in which they conducted the search. They testified that a cursory search failed to reveal James Ellis or any narcotics or related paraphernalia. All that was seized from 638 Pingree that evening was James Ellis's passport and a photograph of Cooper, the confidential informant, which were seized from the bedroom. They further testified that they acted properly while searching the premises, and denied treating Ellis or McCullough improperly or causing any unnecessary or unreasonable property damage.
 
 
 17
 Curlie Thompson, a Wayne County deputy, testified that he manned the ram, a device used for forced entry. He denied saying to Andrea, "Bitch, if you run, you're dead." Instead, he recalled first seeing both plaintiffs together in the living room 10 or 15 minutes after the defendants entered the house.
 
 
 18
 John Walker, a Wayne County deputy, testified that upon entry, he went to the third floor, secured it and searched it, which took about five minutes. He denied saying to Gerald, "Shut up, that's what happens when you're a bad boy."
 
 
 19
 Steve Koester, at the scene as part of the DEA task force, testified that he was part of the initial entry team and had his gun drawn with his hand on the trigger. He admitted he could have pointed his gun at Gerald, but only for a slight second. He did not remember any female officer telling him not to pull the trigger. He could not remember if the raid took 15 minutes or 3 hours.
 
 
 20
 Michelle Delduco, also a Wayne County deputy, testified that she went to the second floor and saw Andrea in the bathroom. Delduco testified she put Andrea against the wall and patted her down. She denied saying anything to Koester. She denied hearing any sounds of property destruction. She testified that she was with both plaintiffs the entire time and in a position to hear any words of abuse, but she witnessed nothing unusual.
 
 
 21
 Melvin Turner, the undersheriff, was present at the raid to ensure that the Wayne County deputies were executing the search warrant in accordance with the established policies of the department. He was outside during the initial entry, but entered the house two or three minutes later. He observed the search in various rooms, saw articles being removed and placed on beds, and saw Andrea with a robe on. The search lasted about 20 minutes. In his opinion, the search was reasonable.
 
 
 22
 DEA agents Philip Maddox, Barry Smith, William Hodges and Scott Roberts neither heard nor saw anything unusual. They testified they were not part of the initial entry team.
 
 
 23
 Both Ellis and McCullough testified that the search commenced shortly after 4:00 p.m. and lasted between 75 and 90 minutes. The log sheets introduced at trial showed that at 6:26 p.m., officers executed a search warrant at 638 Pingree; at 6:32 p.m., the house was secure; and at 6:48 p.m., they left. A number of entries on the page, including 6:26 p.m., appeared rewritten. At 6:48 p.m., the agents went to the Meyers Street house and the hotel to execute warrants. At the Meyers Street location, the agents seized a sizeable amount of drugs and made several arrests. Near the hotel, two agents encountered James Ellis driving a stolen car and arrested him. A search of the hotel room failed to produce any evidence.
 
 B.
 
 24
 On October 23, 1989, Andrea Ellis (hereinafter "Ellis") filed a complaint in Wayne County Circuit Court. The case was timely removed on February 15, 1990, to the United States District Court for the Eastern District of Michigan at Detroit. Ellis's complaint named five defendants: Wayne County Sheriff Robert Ficano, Wayne County, Pamela Elsey, Kenneth Hunter and the City of Detroit. Her complaint pled a cause of action under 42 U.S.C. Sec. 1983 for violation of her Fourth Amendment right against unreasonable search and seizure, and for violation of her Fifth and Fourteenth Amendment rights of due process. She further alleged that all the defendants acted in concert and/or in furtherance of a conspiracy to violate her civil rights. Finally, she pled state torts of invasion of privacy, false arrest and imprisonment, trespass, intentional infliction of emotional distress, negligence and gross negligence. The City of Detroit was dismissed by stipulation on June 22, 1990.
 
 
 25
 On March 19, 1991, Jacqueline Ellis as next friend of Gerald McCullough (hereinafter "McCullough"), a minor, filed suit in the United States District Court, alleging essentially the same causes of action as his grandmother's complaint. McCullough filed an amended complaint on April 9, 1991. He named 16 defendants: Wayne County Sheriff Robert Ficano, Wayne County, Pamela Elsey, Kenneth Hunter, Steve Koester, John Walker, Melvin Turner, Michelle Delduco, David DiBiassi, Curlie Thompson, George McMillan, Roy Adams, William Hodges, Barry Smith, Phillip Maddox and Scott Roberts. Defendants Elsey, Hunter, Koester, Walker, Turner, Delduco and DiBiassi were employed by Wayne County, while defendants McMillan, Adams, Hodges, Smith, Maddox and Roberts were employed by the DEA.
 
 
 26
 All the defendants filed motions to dismiss and/or for summary judgment. On July 22, 1993, the district judge granted the motions in part. First, the district court dismissed all the pendent state law claims against the federal defendants, because the plaintiffs failed to seek a timely remedy pursuant to the Federal Tort Claims Act (FTCA). 28 U.S.C. Secs. 1346(b), 2671-79. With regard to common-law tort claims against the United States, a plaintiff must exhaust administrative remedies under the FTCA. 28 U.S.C. Sec. 2675. In this case, no FTCA remedy was sought. Therefore, the district court dismissed the pendent state law claims against DEA agents McMillan, Adams, Hodges, Smith, Maddox and Roberts.
 
 
 27
 The district court determined that defendants Elsey, Hunter and Koester were also federal defendants for purposes of the FTCA, and dismissed the state law claims against them as well. A declaration by William R. Coonce, special agent-in-charge of the DEA's Detroit field division, together with the contract attached to the declaration, indicate that Elsey, Hunter and Koester were employed by Wayne County, but were assigned to the Wayne County Sheriff's Department/Drug Enforcement Administration joint task force. This joint task force was established to investigate illicit trafficking in narcotics and dangerous drugs. Pursuant to the agreement, Elsey, Hunter and Koester were deputized by the DEA as DEA Task Force officers, and authorized to exercise the powers of enforcement personnel set forth in 21 U.S.C. Sec. 878. Section 878, as amended in 1986, states that "state and local law enforcement officers performing functions under this section shall not be deemed federal employees and shall not be subject to the provisions of law relating to Federal employees, except that such officers shall be subject to section 3374(c) of Title 5. 28 U.S.C. Sec. 878(b). Under 5 U.S.C. Sec. 3374(c), during the period of assignment, a state or local government employee on detail to a federal agency is deemed an employee of the agency for purposes of the Federal Tort Claims Act and any other federal tort liability statute. Therefore, the district court dismissed the state law claims against Elsey, Hunter and Koester in addition to McMillan, Adams, Hodges, Smith, Maddox and Roberts.
 
 
 28
 Second, the district court granted summary judgment to all the defendants on plaintiffs' due process claims under the Fifth and Fourteenth Amendments. The county defendants argued that under Graham v. Connor, 490 U.S. 386 (1989), all claims that law enforcement officers have acted unreasonably should be analyzed under Fourth Amendment standards of reasonableness, rather than under a more vague "substantive due process" approach. In response, plaintiffs agreed that "their 42 U.S.C. Sec. 1983 claim [was] based primarily upon violation of their rights under the Fourth Amendment to be free from unreasonable searches and seizures." Based on this response, the district court assumed that the plaintiffs acquiesced in the dismissal of their due process claims.
 
 
 29
 Third, the district court dismissed all claims against Wayne County and Robert Ficano, the Wayne County Sheriff. The plaintiffs agreed to dismiss those parties and only pursue the county deputies individually.
 
 
 30
 Fourth, the district court granted summary judgment to defendant Hunter on plaintiffs' Fourth Amendment claims relating to the unreasonable manner in which the search warrant was executed. Although the search warrant was secured on Hunter's affidavit, it is undisputed that he did not participate in the actual search.
 
 
 31
 Fifth, the district court dismissed all claims against Wayne County deputy David DiBiassi. It was undisputed that DiBiassi was stationed outside the house and never went inside during the raid.
 
 
 32
 Sixth, the district court dismissed McCullough's claim for property damage during the search. McCullough was only four years old at the time of the search. Furthermore, he did not own the house or any of its furnishings. Therefore, McCullough had no standing to assert a property damage claim.[5]
 
 
 33
 Finally, the district court held that a Sec. 1983 claim could not lie against the federal defendants Elsey, Hunter, Koester, McMillan, Adams, Hodges, Smith, Maddox and Roberts because they were acting under color of federal law, not state law as required by Sec. 1983. However, the district court noted, the federal agents may be sued directly and in an individual capacity for violations of constitutionally protected rights. Bivens v. Six Unknown Agents off Federal Bureau of Narcotics, 403 U.S. 388 (1971). There is no distinction for purposes of immunity law between suits brought against persons acting under color of state law under Sec. 1983 and those brought directly under the Constitution against federal officers under Bivens. Harlow v. Fitzgerald, 457 U.S. 800, 818, n. 30 (1982). Therefore, although the district court dismissed the Sec. 1983 actions against the federal officers, the plaintiffs were left with an appropriate avenue of recovery against them under Bivens for false statements on the warrant or for the manner in which the search was executed.
 
 
 34
 The complaints were consolidated for purposes of discovery and trial. Trial commenced on November 15, 1993. The federal defendants and county defendants were represented by separate counsel. Jury selection proceedings were conducted by consent before a magistrate.
 
 
 35
 The jury selection system in this case consisted of placing 15 jurors in the jury box to conduct voir dire. Four jurors were dismissed for cause and then replaced. The court allowed the defendants a total of four peremptory challenges, two for the federal defendants and two for the county defendants. The plaintiff was allowed three peremptory challenges. At a side bar conference, the lawyers took turns striking jurors. Ideally, eight jurors would be left in the box. If a party failed to use all his or her peremptory challenges, some jurors would be excused as excess.
 
 
 36
 Four of the fifteen jurors were black. Plaintiff used its first peremptory challenge to strike Juror # 3, an Indian psychiatrist. The federal defendants struck juror # 15, a black female. The county defendants struck juror # 7, a white male. Plaintiff then struck juror # 10, a white male. The federal defendants passed. The county defendants struck juror # 8, a black woman. At that point, the following colloquy ensued:
 
 
 37
 MR. POSNER: One moment. He's eliminating all the blacks. He's had two preempts and both blacks. I'll object to that. I'll object to him. He's eliminating all the blacks and that's exactly what he's doing.
 
 
 38
 MR. GAZALL: That's not true.
 
 
 39
 Mr. POSNER: Yes, it is. They both live in Detroit, they both are black and he's eliminating the blacks. I'm putting it on the record, I object to that.
 
 
 40
 THE MAGISTRATE JUDGE: I'm asking you for a statement other than race as to why you excused them.
 
 
 41
 MR. GAZALL: Both of them are young female mothers who are single who I believe identified with the plaintiff in the lawsuit who has a child who is bringing the lawsuit against the defendants.
 
 
 42
 THE MAGISTRATE JUDGE: Okay.
 
 
 43
 Mr. Posner later asked for a mistrial, arguing that counsel for the defendants exercised peremptory challenges on the basis of race. The magistrate found that the defendants had articulated legitimate, neutral reasons for excusal, and stated, "I do not find any grounds for mistrial or any grounds for a racially based challenge whatsoever." The final eight-juror panel was made up of five whites, two blacks and one Hispanic.
 
 
 44
 The trial lasted for nine days. At the end of plaintiff's proof, the district judge granted a judgment as a matter of law on several issues. First, the district judge found as a matter of law that, based on the face of the warrant, the right house was searched. Specifically, the court found that the search warrant described the house to be searched with sufficient particularity as to enable the executing officers to accurately identify the premises, and it was not likely that some other house would be searched by mistake. Second, the district court granted judgment as a matter of law on the remaining property damage claim against Pamela Elsey. The district court stated that in a light most favorable to the plaintiff and based on the plaintiff's account of events, Elsey was one-on-one with Andrea at all times. There was no proof that Elsey was personally involved in the destruction of property or that she was in a position to witness or stop other officers from destroying property. Third, the district court granted the defendants judgment as a matter of law on the issue of whether the entry team waited a reasonable time after knocking and announcing their presence before they forced their way in. Fourth, the district court found as a matter of law that the duration of the search, by any witness's account, was reasonable.
 
 
 45
 The district court also granted a directed verdict to ten individual defendants, nine of which had only been sued by McCullough. The court stated that even if the jury believed everything McCullough and Ellis said, no fourth amendment violation could be based on the verbal statements of deputies Delduco and Walker. Nor could McCullough state a fourth amendment cause of action based on deputy Thompson's actions toward Ellis, or Pamela Elsey's statements to Ellis, or Scott Roberts' actions toward Ellis. Although it is unfortunate that a four-year-old witnessed a drug raid and became frightened when officers displayed force toward his grandmother, he cannot state a constitutional claim as a mere bystander to those events.[6] Further, there was no proof that Agents Adams, Hodges, Smith or Maddox did anything to McCullough or destroyed property. In fact, the proof established that Adams, Hodges, Smith and Maddox entered the house sometime after the initial entry team. The district court initially reserved judgment on deputy Turner, but granted his motion for judgment as a matter of law after hearing the defendants' proof.
 
 
 46
 After the district court had ruled on all the motions for a judgment as a matter of law pursuant to Rule 50(a), only three defendants remained: Hunter, Koester and McMillan. Ellis's single remaining claim was one against Hunter for perjuring himself in order to obtain the warrant. McCullough had a similar claim against Hunter. McCullough's claims against McMillan for (1) supplying false information in support of the warrant, (2) failing to stop execution of a warrant he knew to be invalid, and (3) striking McCullough on the shoulder with the barrel of a rifle, were submitted to the jury. His claim against Koester for pointing a gun at him was also submitted to the jury. These claims went to the jury on November 30, 1993. The jury returned verdicts for the defendants.
 
 
 47
 On December 29, 1993, plaintiffs appealed.
 
 II.
 A.
 
 48
 Plaintiffs' first assignment of error involves the defendants' use of peremptory challenges. Plaintiffs, who are black, argue that the defendants' exercise of two of its four peremptory challenges against black potential jurors deprived them of right to equal protection. In Batson v. Kentucky, 476 U.S. 79 (1986), the Supreme Court held that the Equal Protection Clause prohibits purposeful racial discrimination in the selection of a jury. In order to establish a prima facie case of such discrimination, the plaintiffs must prove three things: (1) that the plaintiffs are members of a cognizable racial group; (2) that the defendants have exercised peremptory challenges against members of the plaintiffs' race; and (3) that the relevant circumstances raise an inference of purposeful discrimination. U.S. v. Ferguson, 23 F.3d 135 (6th Cir.1994) (citing United States v. Peete, 919 F.2d 1168, 1178 (6th Cir.1990)). Once the plaintiffs have established a prima facie case, the burden shifts to the defendants to present a legitimate, neutral explanation for having dismissed the jurors. Id. This court gives "great deference" to the district court's findings on the relevant circumstances and on the credibility of the defendants' proffered explanation. Id. On appeal, the district court's findings are reviewed for clear error. United States v. Peete, 919 F.2d 1168, 1179 (6th Cir.1990).
 
 
 49
 Here, the plaintiffs made a Batson objection after the defendants had made three of their four peremptory challenges. Counsel for the federal defendants had dismissed one black woman, and counsel for the county defendants had dismissed one black woman and one white man. Before fully considering whether the plaintiff had shown a prima facie case of discrimination, the Magistrate Judge asked counsel for the county defendants for a "statement other than race as to why you excused them." At that point, counsel for the county defendants, purportedly defending his dismissal of a single black juror and the federal defendants' dismissal of a black juror, stated that they were both young mothers whom he feared would sympathize with the plaintiffs. The Magistrate Judge found that the defendants had articulated legitimate, neutral reasons for excusal and denied the plaintiffs' Batson challenge and request for a mistrial.
 
 
 50
 Reviewing all of the facts before us, we cannot say that the plaintiffs made out a prima facie case of discrimination. While the plaintiffs clearly met the first two elements of their prima facie case, they did not meet the third element. What constitutes relevant circumstances sufficient to raise an inference of purposeful discrimination has been addressed by the Supreme Court and this Court. In Batson, the Supreme Court stated that circumstances could include whether there was a pattern of strikes against jurors of a particular race, as well as the defendants' questions and comments during voir dire. This court has listed additional factors for trial courts to consider, including (1) the racial composition of the initial group seated as compared to the final panel sworn; (2) the number of peremptory strikes allowed to each side, and (3) the order of strikes and by whom they were exercised. United States v. Sangineto-Miranda, 859 F.2d 1501, 1521 (6th Cir.1988). A prima facie case is weakened if the jury ultimately seated contains members of plaintiffs' minority group. Id.
 
 
 51
 Here, the mere fact that the defendants used 50 percent of their strikes to remove black jurors does not raise an inference of discrimination. Rather, there are a number of facts that weigh against an inference of discrimination. First, the defendants' strikes against blacks were their first and third strikes, not successive. Moreover, the first strike was used by counsel for the federal defendants, while the third strike was used by counsel for the county defendants. There is simply no "pattern" of strikes against black jurors. Further, blacks constituted 26 percent of the original pool of jurors and 25 percent of the jury actually empaneled to hear the case. Therefore, the plaintiffs did not prove a prima facie case of discrimination.
 
 
 52
 While the government is not required to articulate its reasons for exercising its peremptory challenges unless a prima facie case has been established, see Peete, 919 F.2d at 1178, once the reason has been articulated, it too may be examined for evidence of discriminatory intent, given the fact that the district court is charged with considering all relevant circumstances. Plaintiff argues on appeal that the defendants' articulated reason for excusal, that the two jurors were "young female mothers," is a bogus excuse in light of the Supreme Court's holding in J.E.B. v. Alabama, 114 S.Ct. 1419 (1994). While the Supreme Court has extended the Equal Protection Clause to forbid the use of peremptory challenges to eliminate jurors on the basis of gender, J.E.B. v. Alabama, 114 S.Ct. 1419 (1994), it has never forbidden strikes based on motherhood, marital status, age, or age of children. Further, the appropriate inquiry in this case is not whether the articulated excuse was based on gender. Rather, the appropriate inquiry for the court is whether the proffered excuse was legitimate or in fact a pretext for discrimination based on race. The magistrate judge determined that the proffered excuse was not a cover-up for a racially-based challenge, and this finding deserves great deference.
 
 
 53
 Because the plaintiffs failed to make out a prima facie showing of discrimination, we affirm the district court's denial of plaintiffs' Batson challenge.
 
 B.
 
 54
 Plaintiff's second assignment of error alleges that the district court improperly granted judgment as a matter of law on several issues and in favor of several individual defendants. In reviewing a directed verdict under Fed.R.Civ.P. 50, this court applies the same standard as the district court. Nida v. Plant Protection Association National, 7 F.3d 522 (6th Cir.1993). The trial court must determine "whether there was sufficient evidence presented to raise a material issue of fact for the jury." Id. (citations omitted). As applied in this context, "sufficient evidence" is such that, when viewed in a light of those inferences most favorable to the nonmovant, there is either a complete absence of proof on the issue or no controverted issue of fact upon which reasonable men could differ. Id. The district court should neither weigh the credibility of the witnesses nor consider the weight of the evidence. Nor should the district court grant a directed verdict because it believes one witness and does not believe another. Hill v. McIntyre, 884 F.2d 271, 274 (6th Cir.1989).
 
 
 55
 Because the trial court granted a directed verdict on a number of issues and in favor of a number of defendants, separate discussion is in order.
 
 1. Right House/Wrong House Issue
 
 56
 The plaintiffs argue that the district court erred when it determined as a matter of law that the officers searched the correct house on Pingree Street, based on the description on the face of the warrant. This issue is separate and distinct from the issue of whether McMillan and Hunter lied about witnessing a drug buy take place at that house some three days earlier in order to secure the warrant. That issue was submitted to the jury.[7] Rather, the "right house/wrong house" issue at trial was whether the description in the warrant was sufficient to satisfy the particularity requirement of the Fourth Amendment.
 
 
 57
 The test of whether a warrant satisfies the particularity requirement of the Fourth Amendment is divided into two components: (1) whether the place to be searched is described with sufficient particularity as to enable the executing officer to locate and identify the premises with reasonable effort; and (2) whether there is reasonable probability that some other premises may be mistakenly searched. U.S. v. Gahagan, 865 F.2d 1490, 1497 (6th Cir.1989).
 
 
 58
 The warrant described the place to be searched as "627 Pingree Street, which is a two-story, single family dwelling, with red stucco siding", and is the third house west of Second Ave., on the north side of the street. Andrea Ellis testified that her address is 638 Pingree. She testified that no house on Pingree had an address of 627 Pingree. 627 Pingree is an empty lot. Ellis further testified that she considers the house a single family dwelling, with pinkish stucco. She testified that her house is the third structure west of Second Ave., and technically not the third house from the corner, because one structure is an apartment building.[8] Finally, she admitted that she was on the north side of Pingree. All even-numbered addresses were on the north side of the street, while all odd-numbered addresses were on the south side of the street. Therefore, the two incorrect elements in the warrant were the street number and its description as a two-story house. The house had three floors.
 
 
 59
 Based on the entire record, and in a light most favorable to the plaintiffs, reasonable minds could come to only one conclusion--they searched the correct house. The description in the warrant satisfies the particularity requirement of the Fourth Amendment. While the description of the premises was less than perfect, it enabled the executing officers to locate the premises with reasonable effort. Further, because 627 Pingree did not exist, there was no risk that another house would be mistakenly searched. U.S. v. Gahagan, 865 F.2d 1490, 1497 (6th Cir.1989). A directed verdict on this issue was proper.
 
 2. Forced Entry of Premises
 
 60
 Plaintiffs argue that the district court erred in granting a judgment as a matter of law against their claim that the defendants failed to wait sufficient time after knocking and announcing their presence before breaking in. The Sixth Circuit requires officers to knock and announce their presence before entering a residence, absent exigent circumstances. Hall v. Shipley, 932 F.2d 1147 (6th Cir.1991). The Sixth Circuit has never stated a minimum number of seconds an officer must wait after knocking before forcing entry.[9]
 
 
 61
 The proof at trial was undisputed that the officers knocked and waited for an answer. Melvin Turner testified that the entry team waited between 15-20 seconds after they knocked before forcing entry. McMillan testified that they waited on the porch for 10 or 15 seconds while they made sure 638 Pingree Street was the right house. Then they knocked and announced their presence, and waited a reasonable time. When they heard nothing, they forced entry.
 
 
 62
 The plaintiffs' memory of events also establishes that the officers paused for a time after knocking. Ellis testified that she heard "boom boom boom" as she was preparing for her bath. After she heard knocking on the front door, she spat her toothpaste in the toilet and yelled out the bathroom window, "Who is it?" She heard no response. She went into the hall to the top of the stairwell and yelled down toward the door, "Who is it? Stop that before you ..." She stopped mid-sentence as the agents broke down the door. McCullough testified that he heard the knocking, but the officers broke in after his grandmother took too long to answer the door. Plaintiffs offered no other proof on the length of time between the knock and the forced entry.
 
 
 63
 Because the plaintiffs' proof failed to establish how long the officers paused, and because their versions were not inconsistent with the defendants' testimony, the district court did not err in granting a directed verdict on this issue.
 
 3. Duration of Search
 
 64
 Plaintiff next argues that the district court erred in granting a directed verdict on the issue of whether the length of the search was reasonable. The defendants' proof was that the search was cursory and lasted approximately 22 minutes. The plaintiffs testified that the search lasted between 75 and 90 minutes. The district court granted a directed verdict on this issue, stating that even if the search took 90 minutes, and even if some officers suspected early on that the search would not turn up any drugs, 90 minutes was reasonable as a matter of law. Michigan v. Summers, 452 U.S. 692 (1981) (holding that detention of residents while the house is being searched for drugs pursuant to a valid warrant does not violate the Fourth Amendment). We agree.
 
 
 65
 The plaintiff argues that this court's decision in Hill v. McIntyre, 884 F.2d 271 (6th Cir.1989), forbade the district court from granting a directed verdict on the duration of the search. In Hill, we held that a directed verdict was improper where an officer perceived that the house was perhaps not a drug house within the first few minutes of the search, yet one of the occupants was detained for up to an hour. There, this court stated that the jury was entitled to determine whether the duration of the detention was reasonable. Hill, 884 F.2d at 278.
 
 
 66
 Hill does not, however, stand for the proposition that a directed verdict is never proper when the issues at trial are ones of reasonableness. The nonmoving party still must point to sufficient evidence in the record to raise a jury question as to whether the conduct was reasonable. Furthermore, in Hill, the officers admitted that they searched the wrong house. Here, however, the search warrant was for the house intended to be searched. Therefore, directed verdict was proper. Michigan v. Summers, 452 U.S. 692 (1981).
 
 4. Acts of Individual Officers
 
 67
 The plaintiffs next argue that the district court improperly granted directed verdicts in favor of Thompson, Roberts, Delduco, Walker and Elsey regarding their verbal abuse, threats and intimidating conduct toward the plaintiffs during the execution of the warrant. Taking the plaintiffs' testimony as true, directed verdict was still proper.
 
 
 68
 First, Ellis and McCullough complained that Curlie Thompson pointed a gun at Ellis and said, "Bitch, if you run, you're dead." Ellis did not sue Thompson in her complaint. McCullough named Thompson as a defendant in his complaint, but Thompson's acts were not directed at him. Therefore, a directed verdict in favor of Thompson was not error.
 
 
 69
 Ellis and McCullough testified that Scott Roberts pointed a gun at Ellis and told her to get down. When Roberts allowed her to get up, he made her keep her hands on her head even though she told him she had just had surgery and that it was painful. After she got up, Roberts asked her if she had any weapons, and she answered no. Roberts went to search her, but Elsey said that Andrea obviously didn't have any weapons because her nightgown was transparent. She was eventually allowed to get a robe. The district court's directed verdict in favor of Roberts was not error. Ellis didn't sue Roberts. While McCullough did name Roberts as a defendant, there was no proof that Roberts directed any of his attention toward him.
 
 
 70
 Gerald McCullough testified that Koester pulled a gun on him, and he heard Michelle Delduco say to Koester, "Don't pull that trigger." He was crying and frightened, and John Walker told him to "Shut up, that's what happens to bad boys." He further testified that McMillan hit him twice on the shoulder with the barrel of a rifle. After he and his grandmother were escorted downstairs, he heard Elsey threaten his grandmother by saying, "If you don't tell them where the drugs are, they're going to hurt you real bad."
 
 
 71
 Even if Delduco, Walker and Elsey made those comments, isolated threats and verbal abuse are not violations of constitutional magnitude. Fear from spoken words is not an infringement of a constitutional right. See Emmons v. McLaughlin, 874 F.2d 351; Macko v. Byron, 760 F.2d 95, 97 (6th Cir.1985).
 
 
 72
 We agree with the district court that directed verdicts in favor of these individuals were proper.[10]
 
 
 73
 5. Property Damage/Liability for Acts of Others
 
 
 74
 Next, the plaintiff argues that the district court erred in granting a directed verdict in favor of Elsey on the property damage claim. Upon review of the record, however, there was a complete absence of proof that Elsey destroyed property. Therefore, directed verdict was proper.
 
 
 75
 Plaintiffs argued at trial that they were not required to specifically identify which officer destroyed which property. Assuming that property was unnecessarily damaged during the search but plaintiffs couldn't prove by whom, plaintiffs argued that Elsey should be liable for the property damage because she failed to prevent it from occurring.
 
 
 76
 Throughout the trial, the plaintiffs' argued that all the officers who participated in the execution of the search could be held liable for acts "committed jointly, in concert or in combination, or with a common plan or scheme, or acts which lend aid, encouragement, or ratify the wrongful acts of others." (Plaintiff's Reply Brief, at 15).
 
 
 77
 A law enforcement officer has an affirmative duty to stop another law enforcement officer from violating a person's constitutional rights only if he or she has a "realistic opportunity" to do so. In order to have a realistic opportunity to prevent a constitutional violation, the officer (1) must have knowledge that the unconstitutional act is taking place or is about to take place, and (2) must be in a position to actually prevent the act from occurring or continuing. An officer cannot be held liable for the acts of another if he or she didn't anticipate them. Gaudreault v. Municipality of Salem, 923 F.2d 203, 207 n. 3 (1st Cir.1990).
 
 
 78
 Upon thorough review of the record, there was a complete absence of proof that any officer was in a position to stop anything else from occurring. Id. Therefore, directed verdict was proper.
 
 
 79
 Because this court finds that the district court properly awarded directed verdict on several issues and in favor of several defendants, plaintiff's second assignment of error is without merit.
 
 C.
 
 80
 Plaintiff next argues that the district court improperly granted summary judgment on the plaintiffs' Fifth and Fourteenth Amendment due process claims. In support of summary judgment, the county defendants argued that under Graham v. Connor, 490 U.S. 386 (1989), all claims that law enforcement officers have acted unreasonably should be analyzed under Fourth Amendment standards of reasonableness, rather than under a more vague "substantive due process" approach. In response, plaintiffs agreed that "their 42 U.S.C. Sec. 1983 claim [was] based primarily upon violation of their rights under the Fourth Amendment to be free from unreasonable searches and seizures." However, they argued that the alleged conduct also deprived the plaintiffs of their liberty without due process of law. Olson v. Tyler, 771 F.2d 277 (7th Cir.1985). The district court assumed that the plaintiffs acquiesced in the dismissal of their due process claims.
 
 
 81
 Even if the district court misconstrued plaintiffs' brief, it is clear that the Fourth Amendment is the proper tool for analyzing claims grounded in unreasonable search and seizure. Graham v. Connor, 490 U.S. 386 (1989). Therefore, dismissal of plaintiffs' due process claims was proper, and their third assignment of error is without merit.
 
 D.
 
 82
 Plaintiff next argues that the district court erred in granting summary judgment to defendants Elsey, Hunter and Koester on plaintiffs' pendent state law claims. In its order on summary judgment, the district court dismissed the pendent state claims against all the federal defendants because the plaintiffs failed to seek a timely remedy pursuant to the Federal Tort Claims Act (FTCA). 28 U.S.C. Secs. 1346(b), 2671-79. With regard to common-law tort claims against the United States, a plaintiff must exhaust administrative remedies under the FTCA. 28 U.S.C. Sec. 2675. In this case, no FTCA remedy was sought. Plaintiff argues that the court should not have accepted the declaration and the accompanying agreement at face value in determining that Elsey, Hunter and Koester were also federal defendants for purposes of the FTCA.
 
 
 83
 Upon review of the record, we are satisfied with the inquiry and analysis made by the district court. We find no error in the district court's determination. Accordingly, plaintiffs' fourth assignment of error is without merit.
 
 E.
 
 84
 Next, plaintiff argues that the district court erred in granting summary judgment to the federal defendants on plaintiffs' Sec. 1983 claims. In order to hold an individual liable under Sec. 1983, he must be acting under color of state law. This liability is normally enjoyed by state officials. However, a non-state actor, such as a private person, can be liable under Sec. 1983 together with state officials if the private person is involved in joint conduct. The Supreme Court has stated:
 
 
 85
 Private persons, jointly engaged with state officials in the prohibited action, are acting "under color" of law for purposes of the statute. To act "under color" of law does not require that the accused be an officer of the State. It is enough that he is a willing participant in joint activity with the State or its agents.
 
 
 86
 Adickes v. Kress & Co., 398 U.S. 144, 152 (1970) (citations omitted).
 
 
 87
 In opposition to summary judgment, the plaintiffs argued that the Sec. 1983 claims should not be dismissed against the federal defendants because, although they were not state actors, they acted in concert with the state officials. In its order on summary judgment, the court ruled:
 
 
 88
 In the present case plaintiffs do allege in the complaint a conspiracy and state actions by Hunter, McMillan, and county defendant Turner in regards to obtaining the search warrant. However, Turner does not appear to have been involved in obtaining the warrant. Thus, two federal defendants were involved in actions relating to the warrant and Hunter was the affiant. Thus, conspiracy between state and federal officers does not appear present if the alleged conspiracy claimed by plaintiffs involves only the warrant. However, plaintiff can still pursue a Bivens claim against individual federal defendants for false statements on the warrant and manner in which the raid was carried out.
 
 
 89
 Thus, the district court did not specifically rule that the federal defendants were not liable under Sec. 1983. Instead, the court ruled that because the non-state actors in this case happened to be federal officers, the plaintiffs had an adequate vehicle, Bivens, to pin liability on the non-state defendants for carrying out an unreasonable search in violation of the Fourth Amendment. Harlow v. Fitzgerald, 457 U.S. 800, 818 n. 30 (1982) (noting that there is no distinction for purposes of immunity law between suits brought against persons acting under color of state law under Sec. 1983 and those brought directly under the Constitution against federal officials under Bivens ). We agree. Because the plaintiffs were not harmed by this ruling, their fifth assignment of error has no merit.
 
 F.
 
 90
 Plaintiff's final assignment of error arises out of the district court's refusal to permit plaintiffs to call two rebuttal witnesses. The two witnesses would have testified that they lived in plaintiffs' neighborhood and witnessed the raid on 638 Pingree Street commence at approximately 4:00 p.m. The district court denied plaintiff's request to present the two witnesses because they were not listed in the pretrial order. Further, the district court ruled that the plaintiffs should have introduced that proof in its case-in-chief, because it was no secret that the defendants would assert that the raid commenced closer to 6 p.m.
 
 
 91
 A trial court's rulings on the manner and presentation of evidence will not be disturbed absent an abuse of discretion. Mitroff v. Xomox Corp., 797 F.2d 271, 275 (6th Cir.1986). Because we find no abuse of the trial court's discretion in this ruling, plaintiff's sixth assignment of error has no merit.
 
 III.
 
 92
 For the reasons stated, the district court is AFFIRMED.
 
 
 
 [1]
 Honorable L. Clure Morton, United States District Judge for the Middle District of Tennessee, sitting by designation
 
 
 [2]
 One of plaintiff's theories in this case was that the alleged drug buy on October 20, 1987 did not occur, and that Hunter and McMillan made materially false statements in order to procure a warrant. In order to support this theory, plaintiffs exposed the inconsistency between the affidavit (stating that drug buy was made inside the house) and the actual testimony of Hunter and McMillan (that Montrisse delivered a package to the car). Also, Andrea Ellis, Jacqueline Ellis and Montrisse Ellis testified that no drugs had ever been sold in that house. Montrisse and Jacqueline Ellis testified they knew Keno Cooper, but he hadn't been at the house for 3 weeks to a month prior to the raid. They further testified that no one came to the house on October 20, 1987 as stated in the affidavit for the search warrant. Finally, both Andrea Ellis and Jacqueline Ellis were recovering from surgery and only left the house on two occasions in the 4-6 weeks prior to October 23, 1987
 Because of the conflicting testimony, the district court denied summary judgment and denied the defendants' motions for judgment as a matter of law. The issue of whether Hunter and McMillan lied about the drug buy in order to secure a search warrant was submitted to the jury. The jury ultimately found for the defendants.
 
 
 [3]
 Plaintiffs took issue with description of the place to be searched and argued that there was not a sufficient description on the face of the warrant to justify the law enforcement officers decision to enter that house. Further, they argued that McMillan and Hunter had never seen the house previously, but merely picked James Ellis's former wife's house to search
 
 
 [4]
 McMillan had seen the premises earlier while on surveillance and was certain this was the correct house. Hodges also testified that he and McMillan drove by the house to "spot check" it
 
 
 [5]
 After this ruling, the only claim for property damage left for trial was Andrea Ellis's claim against Pamela Elsey individually. Ellis only sued five defendants, and voluntarily dismissed three of them (City of Detroit, Sheriff Ficano and Wayne County). Ellis named two officers individually as defendants, Elsey and Kenneth Hunter. It is undisputed that Hunter did not participate in the execution of the warrant, and was therefore granted summary judgment on all claims arising out of the manner in which the search was executed
 
 
 [6]
 Ellis's own complaint did not name Thompson or Roberts individually as defendants. She did sue Elsey individually, but the district court granted Elsey judgment as a matter of law. The court found that even if the jury believed the plaintiffs' testimony about Elsey's actions, nothing she did to Andrea or Gerald constituted a fourth amendment violation
 
 
 [7]
 On the issue of whether McMillan and Hunter deliberately lied about witnessing a drug buy at 638 Pingree Street in order to obtain a search warrant, the district court found there to be conflicting testimony and therefore declined to grant a directed verdict against those two individuals. Specifically, Hunter stated in his affidavit in support of the warrant that he personally witnessed an informant make a drug buy from within the house on October 20, 1987, three days before the warrant was issued. McMillan wrote a report concerning the controlled purchase, which indicated that he too, was present and witnessed the drug buy
 At trial, however, McMillan claimed that a female, Montrisse Ellis, came out to his car sitting in the driveway and handed him a package that contained a white substance, but he neglected to put this in his report. Hunter testified at trial that his affidavit was also partially incorrect, in that the alleged drug buy did not occur within the house. Rather, Hunter's testimony at trial was consistent with McMillan's trial testimony, that Montrisse had come out of the house to deliver a package, which later tested negative for narcotics.
 The plaintiffs' witnesses testified that no one had been by the house on October 20, 1987; that Kenneth Cooper, the informant, hadn't been at 638 Pingree in over three weeks; and that both Jacqueline and Andrea Ellis were recovering from surgery and did not have company at the house. Further, Montrisse denied delivering a white substance to a car in the driveway on October 20, 1987. Clearly, there was conflicting testimony on this issue. Because its resolution hinged on whom the jury believed, the issue of whether Hunter and McMillan made up their stories about witnessing a drug buy in order to secure a warrant was inappropriate for disposition on directed verdict.
 McMillan was present during the execution of the warrant. If the jury believed that he lied in order to obtain the warrant, then his failure to stop the execution of a warrant he knew to be invalid would also be a basis for his individual liability. This issue was also left in the jury's hands.
 
 
 [8]
 Melvin Turner, a Wayne County deputy, testified that it was the practice of the officers to count structures, not just houses, in locating a premises to be searched
 
 
 [9]
 Plaintiffs argues that Michigan law requires the officers to wait long enough for the inhabitants of the house to reach the front door from the room farthest away. People v. Harvey, 38 Mich.App. 39, 195 N.W.2d 773, 774 (1972). This has never been the rule in the Sixth Circuit
 
 
 [10]
 In evaluating the propriety of a directed verdict against each individual, the trial court accepted the plaintiffs' testimony as true and then evaluated whether the allegations stated a cause of action under Sec. 1983 as a matter of law. The trial court did not weigh the credibility of the witnesses or consider the weight of the evidence
 Further, the district court declined to grant a directed verdict in favor of Koester, for allegedly pointing a gun at a four year old child with the hand on the trigger. She also declined to grant a directed verdict in favor of McMillan, who allegedly struck him on the shoulder with the barrel of a rifle. The reasonableness of these acts were submitted to the jury.